**Wilma TALLENT, Plaintiff–Appellee,**

v.

**TENNESSEE FARMERS MUTUAL INSURANCE COMPANY, Defendant–Appellant.**

Supreme Court of Tennessee, at Knoxville.

Feb. 20, 1990.

David R. Swafford, Pikeville, for defendant-appellant.

William G. McPheeters, McPheeters Law Office, Dayton, for plaintiff-appellee.

## OPINION

HARBISON, Justice.

This case presents the issue of whether the tender of a worthless check for an insurance renewal premium constitutes payment so as to keep the policy of insurance in force. Under the circumstances of this case we hold that the dishonored check did not constitute payment and was not effective to renew the coverage.

There is no dispute as to the material facts. Following a bench trial, the chancellor allowed recovery upon the theory that the insured did not have an opportunity to cover the check after it was dishonored. The Court of Appeals rejected this theory but held that the insurance company was liable because it issued an unconditional receipt to the insured upon receiving her check in the mail despite the fact that the check was later dishonored for insufficient funds. We find neither of these theories to be tenable under the circumstances shown here.

At the outset it should be noted that a contract of insurance is one requiring utmost good faith on the part of both an insured and an insurer. For this reason all of the facts and circumstances surrounding the issuance and receipt of checks for premium payments, including past relationships between the parties, are considered by courts in resolving the frequently litigated issue presented here. As stated in a general encyclopedia:

> There is ordinarily no element of trust relationship involved, except that the duty of acting in perfect good faith rests upon each party to the contract in view of the fact that insurance policies are traditionally contracts uberrimae fidel.

43 Am.Jur.2d *Insurance* § 159 (1982).

The Latin phrase *"uberrima fides"* is defined as follows:

> The most abundant good faith; absolute and perfect candor or openness and

honesty; the absence of any concealment or deception, however slight. A phrase used to express the perfect good faith, concealing nothing, with which a contract must be made; for example, in the case of insurance, the insured must observe the most perfect good faith towards the insurer. Contracts of life insurance are said to be "uberrimae fidei" when any material misrepresentation or concealment is fatal to them.

Black's Law Dictionary, pg. 1363 (5th ed. 1979).

## A. *The Facts*

Plaintiff, Wilma Tallent, purchased the farm of her deceased mother from the other heirs of her mother's estate in May 1986. An existing homeowner's insurance policy carried by the decedent or her executors was transferred to plaintiff at that time, and she was thereafter noted as the insured. The property consisted of a residence and farm buildings on a small acreage tract in Rhea County near Spring City, Tennessee.

Mrs. Tallent testified that she had paid insurance premiums to appellant Tennessee Farmers Mutual Insurance Company in the past, although not specifically with respect to the property in question. The premium on the insurance policy for the period December 19, 1985 to December 19, 1986, had already been paid when Mrs. Tallent acquired the property in May 1986.

On November 12, 1986, the insurance carrier mailed to plaintiff a renewal declaration and premium notice, advising her that the homeowner's policy would expire December 19, 1986.

On the expiration date plaintiff wrote a personal check drawn on her account at Rhea County National Bank in the amount of the insurance premium, $299. This check was mailed to the insurance carrier at its home office in Columbia, Tennessee.

Apparently crossing in the mail with this check was a second notice sent by the company to plaintiff, dated December 19, 1986. This notice stated that the insurance policy had expired for non-payment of the renewal premium. It advised that the poli-

cy could be reinstated with continuous coverage if payment was received by January 2, 1987. The notice stated that "otherwise policy will remain lapsed." It is not disputed that plaintiff received this second notice but took no further steps to pay her premium before January 2 or to insure that her outstanding check would be honored upon presentment.

Plaintiff's check was received by the insurance company on December 22, 1986. It was deposited that day by the insurance company and placed in regular banking channels for payment. On the same date, December 22, 1986, a receipt was sent to the plaintiff stating that the premium payment for the policy had been received and that the policy had been reinstated effective December 19, 1986. Unfortunately, however, plaintiff's check was dishonored for insufficient funds on or about December 23, 1986. The drawee bank mailed her a notice of dishonor and returned the check through banking channels to the insurance carrier. The insurance carrier received the dishonored check on January 7, 1987, and by letter of that date, it advised plaintiff that the policy had lapsed as of December 19, 1986. She was given instructions as to how she might reinstate the policy, but in the interim a fire loss had occurred before plaintiff tendered the renewal premium in cash. The fire occurred on December 28, 1986, destroying the insured residence and its contents. The parties stipulated as to the amount of the loss, $47,400.

The record shows conclusively that the plaintiff did not on the date when she issued the check or at any time thereafter have as much as $299, the amount of the premium, on deposit in her checking account. She knew or must be charged with knowing that the check could not have been honored upon presentation to the drawee bank. She testified that she did not inquire about her balance or make any attempt to ascertain that the check was good when it was drawn. She did not attempt to have the check certified or to have a cashier's check issued, although she was aware that she was mailing the check on the last day of coverage. She made no

arrangement with her bank to advance any overdraft caused by honoring the check.

Plaintiff testified that she had carried insurance with Tennessee Farmers Mutual Insurance Company for many years. These policies consisted of life insurance as well as hazard insurance on her residences and automobiles. She testified:

Q. And you carried very similar insurance, in fact, on homes, property insurance like this that's in question here today?

A. Yes, sir, I sure have.

Q. And during the course of that 18 or so years, you have received many notices of premiums due from your insurance company and you have paid those premiums?

A. Yes, sir, I have.

Q. And you are familiar with the fact that in order to continue coverage you have to pay a premium?

A. Oh, yes.

Q. And you realize, of course, that when you pay a premium by check, obviously your check has to be honored by your bank before that is payment of your premium?

A. Yes, sir.

Plaintiff denied that she received the written notice of dishonor of her check sent by the drawee bank on or about December 23, 1986. She did not, however, deny the bank records offered in evidence with respect to her checking account.

A bank statement dated December 22, 1986 reflected activity on the account for the past month, commencing November 22, 1986. This statement showed a beginning balance of $1.89. It showed deposits of $660, including $100 deposited on December 19, the day she wrote the check to the insurance carrier, and an additional $100 deposited on December 22, 1986. Twenty-four checks in the amount of $406.93 were paid by the bank between November 28 and December 20, 1986. The check to the insurance carrier was not presented to the bank until one day after the period covered by this bank statement. There were additional debits or bank charges against the account of $101.60.

Allowing for checks previously written by the plaintiff and without regard to bank service charges, plaintiff could not have had more than $154.96 on deposit at the time she wrote check number 431 to the insurance company. In addition the bank statement showed that there had been eight checks dishonored for insufficient funds during this period, with a $12 charge being made by the bank for each of these checks, a total charge of $96.00 plus an additional service charge of $5.60. Plaintiff admitted that she received notice of the dishonor of some of these checks, although she said that she did not receive the checks themselves since apparently they were presented a second time and ultimately honored. She did not deny receipt of her bank statement showing the status of her account, with a balance of $153.36 as of December 22, 1986. On December 23, 1986, when her premium check was presented, her balance was $124.26.

### B. *Our Conclusions*

■ In our opinion the bank records demonstrate that at no time material to this case did the plaintiff have or place on deposit sufficient funds to enable the drawee bank to honor the check for the insurance premium in question. This, it seems to us, is a very important fact and one that was not emphasized by either of the courts below. While plaintiff testified that she "thought" she had enough money on deposit to cover the check, her testimony was indefinite and unconvincing in light of the stipulated evidence from the bank as to the state of her account. If she expected to renew the insurance coverage, it was her responsibility, not that of the insurance carrier, to be sure that sufficient funds were on deposit to cover her check or to pay the premium in some other manner such as by certified check or money order.

■ Like the Court of Appeals, we simply find unconvincing the rationale of the trial judge that plaintiff never had an opportunity to cover the check. The check was not good when issued nor was it good

at any time thereafter, including the date of the fire loss.

■ The Court of Appeals held that the insurance company would not have been liable in this case except for its issuing an unconditional receipt to the plaintiff and a notice that the coverage was reinstated at the time when the company received plaintiff's check in the mail. There is nothing in the record, however, to indicate that there was anything out of the ordinary course of business in issuing such a receipt, or that in issuing that receipt the company intended to accept the worthless check as binding payment.

The Court of Appeals recognized the widely accepted general rule that payment of an obligation by check is conditional only until and unless the check is honored upon presentment. *See Bolz v. Security Mut. Life Ins. Co.*, 721 P.2d 1216 (Colo.App. 1986); *Hayworth v. Philadelphia Life Ins. Co.*, 190 N.C. 757, 130 S.E. 612 (1925). It found that presumption to be "rebutted" in this case because of the unconditional receipt.

We do not find this circumstance controlling, especially in view of the fact that the insured never at any time had sufficient funds for the check to be honored. This fact, in our opinion, distinguishes the case relied upon by the Court of Appeals, *Cullotta v. Kemper Corp.*, 78 Ill.2d 25, 34 Ill.Dec. 306, 397 N.E.2d 1372 (1979). In that case the insured had sufficient funds on deposit to cover the check when it was written and sent to the insurance company and for several days thereafter. Further, the insurer held the check for nearly two weeks after notice of dishonor without contacting the insured. Under all of the circumstances the Illinois Supreme Court held that summary judgment for the insurance carrier was not appropriate and that issues of fact were sufficiently raised to require a trial. That, of course, is not the posture of the present case.

■ Many factors, such as delay by the insurance company in depositing a premium check, loans or advances to the insured by agents, interim binders and the like may affect the result in cases such as this. The

general rule is stated in 14A Appleman, *Insurance Law and Practice*, § 8144 (1985) as follows:

> In the absence of an agreement to the contrary, the delivery of a check to an insurer and its acceptance thereof is not payment of the debt until the check itself has been paid. Thus the mere giving or sending of a worthless check to the insurer does not effect the payment of a premium; the result being, if such check is given for the first premium, that coverage never goes into effect; and if given for a subsequent premium, that the coverage is not thereby prevented from lapsing. In order for a worthless check to constitute a valid payment, it must have been unconditionally accepted as such by the insurer.

*See also* 6 Couch, *Encyclopedia of Insurance Law* §§ 31.43–.46 (2d ed. 1985); 43 Am.Jur.2d *Insurance* § 860 and Annot. 50 A.L.R.2d 630 (1956).

The Tennessee courts have long indulged the general presumption that a check is not accepted by a creditor as absolute payment. *See Sizemore v. E.T. Barwick Industries, Inc.*, 225 Tenn. 226, 465 S.W.2d 873 (1971) and cases cited therein. In *Sizemore*, a check was held to be "paid" only when accepted upon presentment, not upon the date of issue or tender to the creditor.

■ Whether a check is accepted as conditional payment or absolute payment is ordinarily a question of fact. In our opinion the presumption that it was accepted as conditional payment in the present case was not overcome by the routine issuance of a receipt or by any other evidence in the record. The policy of insurance, which is the contract between the parties, begins:

> We agree with you, in return for your premium payment, to provide insurance subject to all the terms of this policy. The coverages provided, the limits of our liability and the premiums are shown in the Declarations of this policy.

Nothing by way of past practices, special agreements, premium loans or any other type of evidence was introduced to show that the company in this case acted in any

way differently from its own customary procedures or from those of any other vendor of goods or services in receiving the check of the insured. It promptly deposited the check which, as stated, was not good either when it was issued or when it was presented.

■ While the Court of Appeals relied upon authority that a receipt, issuance of a policy, or crediting payment on its books by an insurance company may be circumstances against the presumption of conditional payment, other cases have held to the contrary. *See Johnson v. Dairyland Insurance Co.*, 398 So.2d 317 (Ala.App.1981); *Washington National Insurance Co. v. Simmons*, 201 Ark. 734, 147 S.W.2d 3 (1941); *Hare v. Connecticut Mutual Life Insurance Co.*, 114 W.Va. 679, 173 S.E. 772 (1934); Annot. 50 A.L.R.2d at 647. The burden of proof is upon the insured to overcome the presumption of conditional payment and to establish waiver by the insurer or a special agreement to accept a check as unconditional payment.

In the present case the Court of Appeals indicated that had the company inserted language in its receipt that payment by check was conditional, the insurer would not be bound. Such a provision is not shown to be customary or legally required in insurance practice or in commercial transactions generally. In our opinion the established presumption that payment by check is conditional is not refuted in this case by the absence of conditional language in the receipt.

The judgments of the courts below are reversed and the suit is dismissed at the cost of appellee. The cause will be remanded to the trial court for collection of costs accrued there and for any other proceedings which may be necessary.

DROWOTA, C.J., and FONES, COOPER and O'BRIEN, JJ., concur.