BEN H. CANTRELL, Judge and
WALTER W. BUSSART, Judge, concur.

## VERMONT MUTUAL INSURANCE COMPANY, Plaintiff–Appellant,

v.

## Marta CHIU, Defendant–Appellee,

and

## First Tennessee National Corporation (Holding Company for First Tennessee Bank National Association and Commercial Credit Plan, Incorporated, Defendants.

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

Jan. 25, 2000.

Application for Permission to Appeal
Denied by Supreme Court
June 12, 2000.

James R. Wheeler, Cheek & Wheeler, PLC, Johnson City, TN, for appellant.

M. Stanley Givens Anderson, Fugate, Givens & Belisle, Johnson City, TN, for appellee.

## OPINION

CHARLES D. SUSANO, Jr., J.

This declaratory judgment action was filed by Vermont Mutual Insurance Company ("Vermont Mutual") against its insured, the defendant Marta Chiu ("Chiu").[1] It was prompted by Chiu's filing of a claim following a fire loss at her house. A jury found that Chiu had made material misrepresentations in her application for a homeowner's insurance policy; however, the jury found that these misrepresentations were not made with an intent to deceive. The trial court then found that there was insufficient evidence that Chiu's misrepresentations had increased Vermont Mutual's risk of loss pursuant to T.C.A.

---

1. The other defendants, First Tennessee National Corporation (Holding Company for First Tennessee Bank National Association) and Commercial Credit Plan, Incorporated, were named as parties by virtue of their status as holders of deeds of trust on Chiu's property. Both defendants were served with pro- cess; neither, however, filed an answer or otherwise attempted to defend Vermont Mutual's action. Upon the insurance company's motion, the trial court entered a default judgment against these two defendants. That judgment is not a subject of this appeal.

§ 56–7–103 [2]; accordingly, the trial court found that Chiu's loss was covered under the policy. Vermont Mutual appeals, contending that the trial court erred in finding that there was not an increase in the risk of loss as a consequence of Chiu's misrepresentations. We reverse.

## I.

In 1993, Chiu applied for a homeowner's insurance policy on her house. She spoke on the phone with Siggy Carlson ("Carlson"), a representative of the Jonesborough Insurance Agency ("the Agency") about obtaining a new policy. Chiu answered the questions on the application while Carlson marked Chiu's answers on the form. One of the questions was as follows: "Are business pursuits conducted on premises?" The box next to this question was marked "N" for "no ." Carlson was aware that Chiu previously had insured her house as a boardinghouse under a commercial policy; for this reason, Carlson asked Chiu whether she was still operating a boardinghouse. Carlson testified as follows:

> I asked her if there were any roomers or boarders still there and she said there were two people there and I asked her to be more specific. And she stated that one of them was a relative that was living there, and I asked her if there was any money exchanged or if he paid any money. She said, "No". Then the other one I believe she said was a niece and she was just visiting.

Chiu's assertion that she no longer had boarders was in fact not true. In addition to the two relatives that Chiu mentioned to Carlson, Chiu had two boarders who paid rent.

Carlson later sent the completed application to Chiu and her husband so that they could review the application and sign it. The application was returned to the Agency with both of the Chius' signatures affixed.[3] The Agency then submitted the application to Vermont Mutual, which approved the application and issued a noncommercial homeowner's insurance policy.

On November 5, 1995, a fire broke out in Chiu's residence. One of the boarders died in the fire. Chiu subsequently filed a claim for the fire loss with Vermont Mutual. That claim was denied on the ground that a commercial operation, *i.e.*, the boarding of tenants, had been conducted on the premises. Vermont Mutual then filed this action seeking to have the policy declared void on the basis of Chiu's misrepresentations. Vermont Mutual alleges in its complaint that Chiu had

> misrepresented material facts in that she denied operating business pursuits in the residence when making application for a homeowners' policy, and in that she forged her husband's name to the application and represented to agents of the Plaintiff that she and her husband lived in the residence alone; and such misrepresentation of fact was material to acceptance of the risk to be assumed by the Plaintiff in issuance of the policy of insurance for which the insured made application.

This action proceeded to trial on November 12 and 13, 1998. The jury was given a special verdict form that posed two ques-

---

**2.** T.C.A. § 56–7–103 (1994) provides as follows:

No written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

**3.** Vermont Mutual asserts in its complaint that Chiu forged her husband's signature on the application and that this forgery was a material misrepresentation. On appeal, however, Vermont Mutual does not attempt to argue that this forgery increased their risk of loss. Thus, we will confine our analysis to those representations made by Chiu regarding business pursuits on her premises.

tions: 1) "Did the Defendant Marta Chiu make material and false representations to the Plaintiff on the application for insurance on the subject dwelling?"; and 2) "Did the Defendant Marta Chiu make material and false representations to the Plaintiff with an intent to deceive?" The jury responded "yes" to the former question and "no" to the latter. As indicated earlier, the trial court then determined that the misrepresentations did not cause an increase in the insurer's risk of loss. This appeal followed.

## II.

T.C.A. § 56–7–103 provides that [n]o written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with actual intent to deceive, *or* unless the matter represented increases the risk of loss.

(Emphasis added). It is clear that the language of the statute is in the disjunctive, *i.e.*, the insurer can defeat coverage by showing either 1) that the misrepresentation was made with the intent to deceive, *or* 2) that the matter represented increased the risk of loss. *Id.; see Clingan v. Vulcan Life Ins. Co.*, 694 S.W.2d 327, 331 (Tenn.Ct.App.1985). In this case, the jury determined that the representations in the application regarding the business pursuits on the premises, although not "made with actual intent to deceive," were, in fact, false; thus, the question for the trial court was whether, as a matter of law, the misrepresentations increased Vermont Mutual's risk of loss.[4]

We review a trial court's determination of a question of law *de novo* with no presumption of correctness. Rule 13(d), T.R.A.P.; *Tennessee Farmers Mut. Ins.*

*Co. v. American Mut. Liab. Ins. Co.*, 840 S.W.2d 933, 936 (Tenn.Ct.App.1992).

## III.

A misrepresentation made in an application for insurance increases the risk of loss "when it is of such importance that it 'naturally and reasonably influences the judgment of the insuror in making the contract.'" *Sine*, 861 S.W.2d at 839 (quoting *Seaton v. National Grange Mut. Ins. Co.*, 732 S.W.2d 288, 288–89 (Tenn.Ct.App. 1987)); *Loyd v. Farmers Mut. Fire Ins. Co.*, 838 S.W.2d 542, 545 (Tenn.Ct.App. 1992). "The matter misrepresented must be of that character which the court can say would reasonably affect the insurer's judgment." *Volunteer State Life Ins. Co. v. Richardson*, 146 Tenn. 589, 244 S.W. 44, 49 (1922). As stated in *Loyd*,

> [i]t is not necessary to find that the policy would not have been issued if the truth had been disclosed. It is sufficient that the insurer was denied information which it sought in good faith and which was deemed necessary to an honest appraisal of insurability.

*Loyd*, 838 S.W.2d at 545.

Upon review of the record in this case, we are of the opinion that the trial court erred in determining that the misrepresentations in the application for insurance did not increase Vermont Mutual's risk of loss within the meaning of T.C.A. § 56–7–103. Our conclusion is supported by the testimony of Robert Fulton ("Fulton"), an assistant underwriting manager at Vermont Mutual, who was tendered by the plaintiff as an expert in insurance underwriting. He testified, in pertinent part, as follows:

Q. When the application is filled out at the agency and signed by the applicant and forwarded to the company, what happens at that point?

A. At that point and time the underwriting process begins and we in fact

---

4. The issue of "risk of loss" under the statute is a question of law for the court. *Sine v.*

*Tennessee Farmers Mut. Ins. Co.*, 861 S.W.2d 838, 839 (Tenn.Ct.App.1993).

review the answers to the various questions. Jumping ahead truthfully to that question is one of the most significant questions for us to look at on an application. If it's marked no, obviously we can move on to other areas such as an insured's prior loss history or have they been canceled for non-payment of premium. If it's marked yes, that begins the underwriting process. Doesn't necessarily mean we're not going to issue coverage but it means at that point and time we begin to collect the necessary information to determine whether we're going to issue coverage, whether we're going to issue coverage with an endorsement, or if we're going to decline coverage.

Q. Okay. And why is that? Why would you decline coverage?

A. Well, again, using this case as an example, we would not write coverage on a boardinghouse with more than two boarders because of the matter of fact of the increased exposure that it presents for the homeowners. There's, the rates on the homeowners do not contemplate a business exposure. When you have, for instance if you have a niece or uncle as has been referenced here, living on the premises and visiting you don't owe the same degree of care that you do to people who are actually paying you rent. You'd have a much higher degree of care that you owe them in maintaining the property.

Q. Okay. And in the course of underwriting, if this application had been marked, "yes", what types of things would have been done specifically here?

A. The first thing we do, the majority of our homeowner policies do not receive inspections. And I'm not talking about the type of inspection that one of our agents would do. Which we refer to as a cursory inspection. They go out ... [and] make sure that the property is essentially in fit condition. We will hire a commercial inspector who will go inside the house and they will go into great detail. They will look at the wiring, they will look at the plumbing. They will look at the liability exposures that again a risk like this would present. We would be looking to make sure that stairways, walkways, are kept in good safe condition. We would be looking if someone had boarders in the basement or in an attic, we would be looking to make sure that there are two means of egress. Even though a local building code may not require that, we as a company would require two means of egress, because plain and simple, if there was a fire and you know, someone got hurt because of the fact there wasn't a second means of egress, we're the one's that are going to pay, not the local building inspector. So that's why we have our standards for what we go looking for in an inspection.

\* \* \*

Q. In your opinion, given your underwriting experience, was there an increased risk of loss in this case because the answer to the question, "Are business pursuits being conducted on the premises", answered in the negative?

A. Most definitely. Because again, the facts as they stand now, had the agent been aware of these facts and been in a position to convey that information to us, we never would have issued this policy.

In our opinion, Fulton's testimony establishes that Chiu's failure to disclose the continuation of her boarding business and the existence of boarders in her home increased the risk of loss. Under the circumstances of this case, it is clear that the information was of such importance as to "naturally and reasonably influence[ ]" the judgment of Vermont Mutual in issuing the policy. *See Sine*, 861 S.W.2d at 839; *Loyd*, 838 S.W.2d at 545. In fact, it appears clear from Fulton's testimony, that the information, had it been known, would have resulted in the company's refusal to issue a standard homeowner's insurance policy.

Chiu argues that Fulton's opinion has no basis in fact because he did not offer any specific evidence of facts, figures or examples to show precisely how the existence of boarders on the property increased the risk of loss to the insurer. We find Chiu's argument to be without merit. "It is only necessary to determine that the misrepresentation was sufficient to deny the insurer of information which they, in good faith, sought to discover, and which they must have deemed necessary to an honest appraisal of insurability." *Johnson v. State Farm Life Ins. Co.*, 633 S.W.2d 484, 488 (Tenn.Ct.App.1981). The existence of a business operation on the premises was information that the insurance company in this case "sought to discover." This is evidenced by the specific question posed on the application regarding whether a business was being operated in the home. Furthermore, Fulton's testimony establishes that information regarding business pursuits on the premises was necessary for "an honest appraisal of insurability." *See Richardson*, 244 S.W. at 49 ("the practice of an insurance company with respect to particular information may be looked to in determining whether it would have naturally and reasonably influenced the judgment of the insurer …").

If Chiu had answered the question truthfully, Vermont Mutual could have taken additional measures to make a "honest appraisal of insurability." It is apparent from Fulton's testimony that Vermont Mutual would have conducted a closer inspection of the house in order to assess the risks posed by the presence of this commercial operation in Chiu's home. However, because of Chiu's misrepresentations, Vermont Mutual was denied this opportunity to inspect and thus suffered an increased risk of loss.

Our conclusion that the existence of Chiu's business pursuits on the premises is a factor that would "naturally and reasonably influence" an insurer's judgment is also a matter of common sense. Generally speaking, a homeowner exercises a lesser degree of control over the activities of a stranger who is paying rent than he or she does over, for example, another family member. By paying money to live in the house, a boarder not only receives a room but also some degree of privacy. This privacy means that the homeowner has little or no ability to control or even become aware of the activities that occur in the area of the house occupied by the boarder. Thus, it is logical that risks may arise in the boarder's rented area that the homeowner is not aware of and thus cannot prevent. These are risks that an insurer is entitled to assess before issuing a homeowner's insurance policy.

We find that Chiu's misrepresentations concerning the operation of a business on her premises had the effect of increasing Vermont Mutual's risk of loss, in accordance with T.C.A. § 56–7–103. We therefore hold that the trial court erred in determining that Chiu was entitled to recover under the policy.

### IV.

The judgment of the trial court is reversed. Costs on appeal are taxed to the appellee. This case is remanded for the entry of an appropriate order, consistent with this opinion.

HOUSTON M. GOODDARD, P.J., and HERSCHEL P. FRANKS, J., concur.