# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
October 1, 2002 Session

## CONSUMERS INSURANCE USA v. VIRGIE SMITH, ET AL.

**Appeal from the Chancery Court for Washington County**
**No. 33195      G. Richard Johnson, Chancellor**

**FILED DECEMBER 23, 2002**

**No. E2002-00724-COA-R3-CV**

---

Consumer Insurance USA ("the insurance company") brought a declaratory judgment action against one of its policyholders, Virgie Smith ("the policyholder"), age 80 at the time of trial, and others,[1] seeking a declaration regarding its liability under an automobile insurance policy ("the policy") issued by it to Ms. Smith. The suit was prompted by a two-vehicle accident involving an automobile being driven by the policyholder's great-grandson, Thomas G. Tuten ("the great-grandson"), in which Tuten and another were killed and two other individuals in his vehicle were injured. The trial court held that the vehicle being driven by the great-grandson, a 1989 Chevrolet Camaro ("the Camaro"), was a "newly acquired auto" under the terms of the policy, was reported to the insurance company within 14 days of its purchase, and was, consequently, a covered vehicle under the policy as of the date of its purchase, *i.e.*, June 29, 1999, some 12 days before the accident on July 10, 1999. Because we hold that the evidence preponderates that the policyholder made material misrepresentations to the insurance company that void the policy, we reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Thomas C. McKee, Johnson City, Tennessee, for the appellant, Consumers Insurance USA.

Thomas C. Jesse, Johnson City, Tennessee, for the appellees, Virgie Smith and Estate of Thomas G. Tuten.

---

[1] The other defendants are the estates of the policyholder's great-grandson, Thomas G. Tuten, and his girlfriend, who was a front-seat passenger in his car; the injured parties in his vehicle; the owner of the other vehicle; and Nationwide Insurance Company, the uninsured motorist carrier for one of the injured passengers.

Evan M. Meade, Johnson City, Tennessee, for the appellees, Carol Garney, Christopher Brackins, Eugene Brackins, and Estate of Audry L. Conn.

Brian H. Trammell, Knoxville, Tennessee, for the appellee, Nationwide Insurance Company.

## OPINION

### I.

On July 10, 1999, the great-grandson, age 17 at the time, was driving the Camaro, a vehicle titled to the policyholder. He was returning to Johnson City from Gatlinburg when he collided with a truck ("the collision"). As a result of the collision, the great-grandson and his girlfriend were killed and two individuals in the back seat of his vehicle were injured. At the bench trial in this declaratory judgment action, the insurance company sought to avoid liability under the policy for the collision. The insurance company contended at trial that: (1) the Camaro was not a covered vehicle at the time of the collision under the terms of the policy pertaining to a "newly acquired auto"; (2) the policyholder failed to timely notify it regarding the purchase of the Camaro; (3) the policyholder did not have an insurable interest in the Camaro; and (4) the policyholder made a material misrepresentation regarding the great-grandson's presence in her home and that this misrepresentation voided the policy.

### II.

The insurance company and the defendants filed competing motions for summary judgment. The trial court granted the defendants summary judgment as to the issue of the date of purchase of the Camaro, finding the vehicle to have been purchased on June 29, 1999. Thereafter, following a full evidentiary hearing, the trial court held that the policyholder or someone acting on her behalf had timely notified the insurance company regarding the purchase of the vehicle – a vehicle that the trial court found to have been purchased and owned by the policyholder.

### III.

The great-grandson was born October 7, 1981. Shortly after his birth, he came to live with his great-grandmother, *i.e.*, the policyholder. In October, 1982, the policyholder became his legal temporary guardian.[2] The great-grandson resided with the policyholder for the remainder of his short life.[3]

---

[2] The temporary custody order was never modified.

[3] The great-grandson's mother is Robin Hills, who is the granddaughter of the policyholder. At the time of the accident, Ms. Hills was also living with the policyholder. Her name was listed on the policy.

In December, 1995, the policyholder purchased a policy of automobile liability insurance from the insurance company. The application process was paperless. It consisted of the insurance agent asking her questions, the answers to which were then input into the application on the computer screen. The policyholder "signed" an electronic touchpad to indicate her assent to the answers given to the agent.[4] Among the questions posed to her was whether there were individuals residing with her 14 years of age or older. According to the computer record, the policyholder responded in the negative to this question, even though by December, 1995, the great-grandson was already 14 years old and living in her residence. In her testimony, she did not deny that she was asked this question. Furthermore, she acknowledged that she did not tell the agent about the 14-year old residing with her.

The initial policy term was for six months, subject to renewal for subsequent six-month periods. Near the end of each six-month term, the insurance company would mail the policyholder a renewal form, a part of which was to be returned to the insurance company with her check for the first month's premium.[5] The renewal form looked much like an ordinary bill. The top two-thirds of the form contained general information about the policy, while the bottom one-third was an invoice to be detached from the rest of the page and returned to the insurance company with the premium payment. Among other printed information on the top portion of the renewal form were the following two sentences:

> Please review your policy coverage information on the back side of this form. *If any changes are needed*, contact your agent immediately.

(Emphasis added). On the back side of the lower portion, *i.e.*, the invoice, were questions regarding any changes since the last renewal. One specific question inquired as to whether there were any occupants of the household "14 years or older who are not listed above." The only names listed on the form were the policyholder and her granddaughter, whose name was then Robin Holmes. Prior to the accident, the policy had been last renewed for the period June 5, 1999, to December 5, 1999.

There is some ambivalence in the policyholder's testimony regarding her knowledge, or lack thereof, regarding the inquires on the back of the invoice. On cross examination, the policyholder stated that she was aware of the contents of the reverse side of the invoice. She acknowledged that she failed to fill out the form and stated that her failure was because she knew that adding a new driver would increase the amount of the premium. On redirect examination, however, she partially reversed herself and testified that she did not know there were inquiries on the back side of the invoice.

---

[4]Testimony offered by the insurance company indicated that it was the company's practice to print the application and mail it to the applicant.

[5]Even though the policy term was for six months, the policyholder had the option of paying her premiums monthly. She had elected this option.

On two occasions after the policyholder took out the policy, but before the collision, she called the local agency of the insurance company with questions regarding her policy as it related to the great-grandson. When he turned 15, she called and asked whether a driver with a learner's permit would be covered while driving her car. The agent told her that if a listed driver was in the car with the newly permitted driver, the latter would be covered. On another occasion, the policyholder contacted the local agency to inquire as to the effect of a 16-year-old on her insurance premium. The policyholder was told that her premium would increase substantially. The policyholder did not add the great-grandson to her policy, and she did not change her coverage in any way as a result of these conversations.

There is a dispute in the record as to whether the policyholder gave the local agency her name when she made these two telephone calls. On cross examination, the policyholder stated that she made only general inquiries and she did not volunteer her name. On redirect examination, however, she stated that she thought she might have supplied her name, but was not sure. Witnesses associated with the insurance company testified unequivocally that had the policyholder revealed her name, the telephone calls would have been noted in the computer record. They testified that these types of questions would have triggered further investigation into her circumstances to determine whether there was a person at or near driving age living in her household who was not noted on the policy.

Some time after the great-grandson turned 16, but before he purchased the Camaro, he did purchase another vehicle. The car was titled in his name. He did not obtain insurance on this vehicle. The policyholder never inquired about adding the great-grandson or the car on her policy. The policyholder testified that this automobile was a "lemon," and after about two months, the great-grandson gave it to a tow truck driver who picked up the disabled vehicle. The great-grandson had purchased the vehicle to get to work. With the exception of the short time that he owned this car, he would sometimes drive the policyholder's Chrysler LeBaron to work. The great-grandson was not listed as a driver on the policy for the LeBaron or otherwise. A representative of the insurance company testified that the company did not know about the great-grandson's presence in the policyholder's home until after the accident that took his life.

In June, 1999, the great-grandson saw the Camaro parked on a used car lot. According to the policyholder, the great-grandson immediately "fell in love" with the car, and desperately wanted to buy it, but he lacked adequate funds to do so. On June 24, 1999, the policyholder and the great-grandson went together to the used car lot and attempted to purchase the automobile. The Camaro cost more than the two of them could afford at that time; however, the policyholder reached an agreement with the car dealer to purchase the Camaro for approximately $5,000. The policyholder tendered $3,000, apparently by way of cash secured through credit cards, and the great-grandson contributed $300. The policyholder left a check with the dealer for the balance of the purchase price, but it was understood that the dealer would not cash the check. The policyholder promised to return within a few days with $1,700 in cash to cover the balance of the price. The dealer retained the car and the title, but agreed not to sell the car to anyone else. The dealer's bill of sale and the certificate of title reflect a purchase date of June 24, 1999. However, neither the policyholder nor the great-

grandson received possession of the car or the certificate of title until after the policyholder paid the balance of the purchase price on June 29, 1999.

After taking possession of the vehicle on June 29, 1999, the policyholder registered the car in her own name. Apparently, she attempted to title the car in the great-grandson's name, but because the bill of sale reflected her as the purchaser, the county clerk's office told her she would have to wait until the state issued her a title before she could re-title the car. At trial, the policyholder testified that she intended to wait until October 7, 1999, the great-grandson's 18th birthday, to title the car in his name; however, in another part of her testimony, she intimated that, had the great-grandson not died in the collision, she would have re-titled it to him as soon as she received her title.

The policyholder lived on a fixed income at the time she purchased the Camaro. Therefore, it was impossible for her to assume the cost of this vehicle long term. The arrangement she and the great-grandson reached was that he was to make payments on her credit cards to reimburse her for the purchase of the vehicle. There was never any formal loan arrangement, but it appears that an informal agreement did exist.

After purchasing the Camaro, neither the policyholder nor the great-grandson made any attempt to insure the Camaro. It was only after the accident that the insurance company was advised about the purchase of the Camaro.

There are a number of inconsistencies in the policyholder's testimony. The following exchanges highlight these inconsistencies:

\* \* \*

Q. [Y]ou just decided that you wouldn't tell the insurance agency about [the great-grandson] and you would just limit the extent to which he drove your [LeBaron]. Just like you said, he didn't drive it much. Is that right?

A. That's right.

Q. And then when he bought his own vehicle, you knew that he had to have insurance, but you knew you couldn't afford it.

A. Yes sir.

Q. And he would have to give you the money for it before you could buy it. Is that right?

A. That's correct.

Q. And this wreck happened before he -- before he had given you enough money to buy that insurance. Is that right?

A. That's correct

Q. And you just ignored these notices when they wanted to know about whether or not you had any other body -- any other person in your household that was a driver of fourteen older -- right? Fourteen years of age or older. You just ignored that, didn't you?

A. Yes, I did.

Q. And you intentionally didn't fill that out, didn't you?

A. No sir, I didn't.

Q. I mean, you did not fill that out and you meant not to fill that out. Is that right?

A. That's right.

Q. Okay. Now, when you called the agency asking them about the price of the insurance, you didn't tell them who you were or anything like that; you just told them -- you just called and said, "How much would it cost if I added a fourteen...

A. Yes sir.

Q. ... – a fourteen-year-old to my policy?" Is that right?

A. That's right.

Q. You didn't say, "This is Ms. Smith, and this is..."

A. No sir.

Q. You just asked a general question.

A. Yes sir.

*  *  *

Q. When [the great-grandson] got his learner's permit you called your insurance agent, did you not?

A. Yes sir.

Q. And you asked them whether or not you needed to get any additional insurance for him to drive your car, didn't you?

A. Yes sir.

Q. And they certainly knew at that time that you had a boy of age to have a learner's permit in your home.

A. Yes sir. And they told me that he was insured as long as I had that learner's permit.

Q. Okay. And that was at the time he got his learner's permit that you called your agent?

A. Yes sir.

Q. Okay. Is there any doubt in your mind that they knew that you had another driver, a permitted driver, in your home?

A. No sir.

* * *

Q. When you called about the learner's permit for your...

A. About what?

Q. The learner's permit for [the great-grandson]. Is that right?

A. Yes sir.

Q. Okay. Did you call the insurance agency or the insurance company?

A. I called that one in Johnson City, the agency.

Q. Okay. The agency. And at that time did you tell them who you were and identify [the great-grandson] or did you just say...

-7-

A. Yes sir.

Q. You did?  You didn't just say,...

A. No sir.

Q. ..."if I get -- if I have a kid on a leaner's permit, then what effect will that have on me,...

A. Yes sir.

Q. ...is he covered?"  Or did you say, "I'm Ms. Smith.  I'm one of your insureds..."

A.  I don't remember.

Q. Okay.  So, you don't know at that time whether or not you identified yourself as a policyholder...

A.  No sir, I don't.

Q. ...or you just simply asked a question, "If I have a child..."

* * *

Q.  All right.  But you don't know as a matter of fact that you told them who you were and that you had a sixteen-year-old -- a fifteen-year-old in the household with you, do you?

A.  No sir.

Cynthia Ayers, the employee at the agency who was responsible for the policy, testified that she was 100% certain that had the policyholder called, provided her name, and asked questions suggesting that a young driver (or soon-to-be driver) resided in the policyholder's household, some record of the call would have been made.  Ms. Ayers testified that there was no such record.  The only meaningful challenge that the policyholder and other defendants could raise to Ms. Ayers' credibility was the fact that she was not necessarily the person who answered the phone on the occasions when the policyholder claimed to have called regarding the great-grandson.

IV.

The insurance company raises four issues on appeal.  The first issue regards the purchase date of the Camaro, the subject of the grant of partial summary judgment by the trial court in the

defendants' favor. The second issue involves whether the policyholder or anyone in her family timely took appropriate steps to cause the Camaro to become a "newly acquired auto" under the terms of the insurance contract and whether the notice to the insurance company was effective as of the date of purchase. This involves a question of if and when the insurance company received notice of the purchase of the Camaro. The third issue the insurance company presents is whether the policyholder had a sufficient insurable interest in the Camaro. The fourth issue is whether the policyholder made a material misrepresentation such as would void the policy. In its opinion, the trial court directly addressed the first two issues. As to the third issue, the trial court found that the policyholder owned the Camaro but the court did not explicitly discuss the insurance company's arguments on the issue of "insurable interest." The court's opinion does not discuss, in any way, the fourth issue pertaining to the effect of a material misrepresentation. All four of these issues were clearly pled and tried. The policyholder does not argue that the insurance company is raising any of these issues for the first time on appeal.

V.

Since the trial court disposed of the issue regarding the date of purchase of the Camaro via partial summary judgment, our review focuses on the principles applicable to such a disposition. Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. Since summary judgment presents a pure question of law, our review is *de novo* with no presumption of correctness as to the trial court's judgment. *Gonzales v. Alman Constr. Co.*, 857 S.W.2d 42, 44 (Tenn. Ct. App. 1993). We must decide anew if summary judgment on this issue is appropriate.

All parties agree that there is no dispute regarding the material facts impacting the summary judgment issue of the date of purchase of the Camaro. We find, as a matter of law, that title to the Camaro passed to the policyholder on June 29, 1999. Despite the fact the bill of sale and the title indicate that June 24, 1999, was the date of sale, the circumstances surrounding this transaction conclusively demostrate that the sale actually took place on the later date. The insurance company asserts that the bill of sale and the title speak for themselves and are proof of the date of sale. However, the insurance company does not dispute that the dealer retained possession of the car and the title until after the policyholder tendered full payment for the vehicle. The passing of title is governed by Tenn. Code Ann. § 55-3-118 (1998):

> (a) In order to transfer title to any motor vehicle coming within the title provisions of chapters 1-6 of this title, the owner shall endorse an assignment and warranty of title upon the certificate of title, if in such owner's possession, for such vehicle, with a statement of all liens or encumbrances thereon, and the owner shall deliver the certificate of title to the purchaser or transferee at the time of delivering the vehicle...

Under this language, title in this case did not pass until physical delivery of the Camaro and the certificate of title. In fact, physical delivery of the vehicle and title did not occur until June 29, 1999. Though there is case law indicating that the intention of the parties can control over the date of transfer of title, *see, e.g., Smith v. Smith*, 650 S.W.2d 54, 56 (Tenn. Ct. App. 1983), the insurance company offered no evidence indicating a contrary intent. The dealer surrendered title when the policyholder tendered full payment and took possession of the car. Therefore, we affirm the trial court's grant of partial summary judgment on this issue. The Camaro was purchased on June 29, 1999, and whether the insurance company was notified of the purchase within the required period of 14 days must be measured from that date.

The insurance company argues that parol evidence cannot be used to vary the date on the bill of sale. Even assuming that the bill of sale is a contract to which the parol evidence rule is applicable, that "rule applies only between the parties to the written contract and strangers cannot raise the question of the admissibility of parol evidence to vary a written contract." *Evans v. Tillett Bros. Constr. Co.*, 545 S.W.2d 8, 12 (Tenn. Ct. App. 1976). The parol evidence rule is not implicated by the facts of this case.

VI.

The issue regarding whether the insurance company was timely notified of the purchase of the Camaro was resolved by the trial court following a bench trial. Accordingly, we review the trial court's factual determinations on the timely notification issue *de novo* with a presumption of correctness, and we will not overturn such findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Bank/First Citizens Bank v. Citizens & Assocs.*, 82 S.W.3d 259, 262 (Tenn. 2002). Furthermore, "when the trial court has seen the witnesses and heard the testimony, especially where issues of credibility and the weight of testimony are involved, the appellate court must extend considerable deference to the trial court's factual findings." *Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 732 (Tenn. 2002).

The policy provides for coverage of a "newly acquired auto." The applicable policy language is as follows:

> 2. Coverage for a "newly acquired auto" is provided as described below. If you ask us to insure a "newly acquired auto" after a specified time period described below has elapsed, any coverage we provide for a "newly acquired auto" will begin at the time you request the coverage.
>
> > a. For any coverage provided in this policy except Coverage For Damage To Your Auto, a "newly acquired auto" will have the broadest coverage we now provide for any vehicle shown in the

Declarations. Coverage begins on the date you become the owner. However, for this coverage to apply to a "newly acquired auto" which is in addition to any vehicle shown in the Declarations, you must ask us to insure it within 14 days after you become the owner.

If a "newly acquired auto" replaces a vehicle shown in the Declarations, coverage is provided for this vehicle without your having to ask us to insure it.

The Camaro did not replace any other vehicle, and clearly it was "in addition to any vehicle" already covered under the policy. Coverage for the "newly acquired auto" is effective "on the date [the policyholder] bec[ame] the owner" if the insurance company was advised of the vehicle within 14 days of its purchase.

The trial court found that the policyholder's testimony was somewhat vague on the issue of whether she called the insurance company to notify it of the purchase of the Camaro. However, the agent, Ms. Ayers, acknowledged that the policyholder's granddaughter had called the agency with this information and had done so on July 12, 1999, within 14 days of the critical date of June 29, 1999. Ms. Ayers further testified that as a result of this call, she added the Camaro to the policy as a newly acquired auto. The trial court appears to have given Ms. Ayers' testimony a great deal of weight and based its factual determination on this evidence. As the trial court stated in its bench opinion, "[t]he question is: Did [the policyholder], or someone on her behalf, notify the insurance company within the fourteen-day period?" The court below answered this question in the affirmative. We do not find that the evidence preponderates against this finding of fact. Accordingly, there is no basis for disturbing the trial court's finding that the insurance company was notified of the purchase of the Camaro within 14 days of the transfer date of June 29, 1999.

The trial court based its ultimate judgment on the fact that the insurance company received notice of the Camaro as required by the policy, and, therefore, it was covered under the policy as of the date of purchase and thus was a covered vehicle when the accident occurred on July 10, 1999. The trial court apparently found that this issue was dispositive because it failed to address in detail the "insurable interest" question and totally ignored the material misrepresentation issue. We hold that the latter issue requires a reversal of the trial court's judgment.

VII.

When the trial court explained its ruling from the bench, it made several conclusions of law that the insurance company now challenges on this appeal. We review a trial court's conclusions of law *de novo* with no presumption of correctness attaching to such determinations. *See Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

VIII.

The insurance company asserts that it has no liability with respect to the Camaro because, so the argument goes, the policyholder did not have a sufficient legal interest in that vehicle to bring it within the protection of her policy. The insurance company argues that the policyholder did not actually own the Camaro, and, hence, she had no insurable interest in it. We do not find this argument persuasive. The policyholder paid 94% of the purchase price of the vehicle. The only title issued by the state reflects that she was the owner of the car.

Tennessee law broadly construes the term insurable interest, and we find that the policyholder had an insurable interest in the Camaro. "A person has an insurable interest in property if he or she derives benefit from its existence or if he or she would suffer loss from its destruction. *Baird v. Fidelity-Phenix Fire Ins. Co.*, 178 Tenn. 653, [669], 162 S.W.2d 384, 390[-91] (1942); *Oliver v. Johnson*, 692 S.W.2d 855, 857 (Tenn. Ct. App. 1985)." *Allman v. Allman*, No. M1997-00251-COA-R3-CV, 2000 Tenn. App. LEXIS 766, at *12 n.5 (Tenn. Ct. App. M.S., filed Nov. 22, 2000). Under this definition, it is quite clear that the policyholder had an insurable interest in the Camaro. The great-grandson's interest, use and potential title ownership does not vitiate the policyholder's insurable interest. The insurance company's third issue is found to be without merit.

IX.

Based on the foregoing, we conclude that the Camaro was properly brought within the coverage of the policy. However, our inquiry does not end there. This is because the insurance company argues that the policy is void because, so the argument goes, the policyholder made a material misrepresentation to the insurance company regarding the policy.

X.

The issue of whether the policyholder made a misrepresentation to the insurance company presents a question of fact. *Vermont Mut. Ins. Co. v. Chiu*, 21 S.W.3d 232, 235 (Tenn. Ct. App. 2000). The trial court made no factual findings regarding this issue. When a trial court makes no findings of fact, we must determine the preponderance of the evidence *de novo* with no presumption of correctness, because there are no findings to which such a presumption can attach. *See Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

Tenn. Code Ann. § 56-7-103 (2001) addresses the subject of misrepresentations to insurance companies "in the negotiations of a contract or policy of insurance, or in the application therefor." That statute provides as follows:

> No written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless

-12-

such misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

We pointed out in the ***Vermont Mut. Ins. Co.*** case that an "insurer can defeat coverage by showing either 1) that the misrepresentation was made with the intent to deceive *or* 2) that the matter represented increased the risk of loss." ***Id***. at 235 (emphasis in original). The issue of "risk of loss" under the statute is a question of law for the court. ***Id***. at 235 n.4.

In the instant case, the evidence preponderates in favor of a finding that the policyholder – in answering the agent's questions when she initially applied for the policy on December 5, 1995 – failed to disclose the fact that the great-grandson, then age 14, was living in her home. The policyholder admitted this in her testimony:

> Q. Now, when they – at the time that you got your initial policy from them, they sat down with you and they asked you questions. Is that right?
>
> A. Yes, sir.
>
> Q. O.K. And at that time you did not tell them that [the great-grandson] was in your household, did you?
>
> A. No, sir, I didn't.
>
>                      \*     \*     \*
>
> Q. ...Do you remember ever signing anything at the insurance agency when you did your original application?
>
> A. Oh, yes, sir.
>
> Q. O.K. And they asked you at that time who the members of the household were and you did not mention [the great-grandson], did you?
>
> A. I might not have had him at that time.
>
> Q. O.K. You may not have had him at that time?
>
> A. Yeah, I did too.
>
> Q. You didn't mention him, did you?

-13-

A.  No, sir.  Maybe because he was so little.

An agent at the agency where the policyholder initially purchased the policy stated unequivocally, and without contradiction, that one of the questions on the application – electronically agreed to at the end of the process – inquired as to the identity of the individuals in the applicant's household who were *fourteen* years of age or older.  The evidence preponderates that the policyholder was asked this question and responded without mentioning the great-grandson, then age 14.  Accordingly, we find that the evidence preponderates in favor of a finding that the policyholder made a misrepresentation to the insurance company when she initially secured the policy.

The record is not entirely clear as to why the policyholder failed to tell the agent about the 14-year-old living with her.  At one point in her testimony, she alluded to the fact that he was "little," apparently referring to his stature.  A fair inference from this testimony is that she temporarily forgot he was 14, because he was so small.  Considering the totality of the proof, we cannot say that the evidence preponderates in favor of a finding that the policyholder made the subject misrepresentation with "actual intent to deceive."  *See* Tenn. Code Ann. § 56-7-103.  It is clear, however, that the policyholder made a representation, *i.e.*, the identity of those in her household, that was not entirely complete and hence not entirely true.  This amounts to a *mis*representation.  Under the statute, Tenn. Code Ann. § 56-7-103, we must decide whether the policyholder's misrepresentation was material, *i.e.*, whether it "increase[d] the risk of loss."  *Id*.

We addressed the statutory concept of "risk of loss" in the ***Vermont Mut. Ins. Co.*** case:

> A misrepresentation made in an application for insurance increases the risk of loss "when it is of such importance that it 'naturally and reasonably influences the judgment of the insuror in making the contract.'" ***Sine [v. Tennessee Farmers Mut. Co.]***, 861 S.W.2d [838, 839 (Tenn. Ct. App. 1993)] (quoting ***Seaton v. National Grange Mut. Ins. Co.***, 732 S.W.2d 288, 288-89 (Tenn. Ct. App. 1987)); ***Loyd v. Farmers Mut. Fire Ins. Co***., 838 S.W.2d 542, 545 (Tenn. Ct. App. 1992).  "The matter misrepresented must be of that character which the court can say would reasonably affect the insurer's judgment." ***Volunteer State Life Ins. Co. v. Richardson***, 146 Tenn. 589, [606], 244 S.W. 44, 49 (1922).  As stated in ***Loyd***,
>
>> [i]t is not necessary to find that the policy would not have been issued if the truth had been disclosed.  It is sufficient that the insurer was denied information which it sought in good faith and which was deemed necessary to an honest appraisal of insurability.

*Vermont Mut. Ins. Co*., 21 S.W.3d at 235.

An employee of the insurance company who was involved in underwriting was asked why the insurance company was interested in the identity of individuals who where not yet of legal driving age. He responded as follows:

> Because we input that information into our system, and then that way, when someone turns fifteen or sixteen, we send a notification out to the agent to get additional information about that person.

The wisdom of such a procedure and its importance to the insurance company in ferreting out risk-relevant facts and assessing those facts is well illustrated by the facts of the case at bar.

The same witness was asked about the risk of loss to the insurance company of covering young drivers. He testified that there was a "significantly higher" risk and that the insurance company addressed this risk, when it was willing to cover such drivers, by charging a higher premium. With respect to the risk presented by young drivers, he testified thusly:

> Well, we refer to them as inexperienced operators, basically, which is just like anything; the longer you do it, the better you are at it. With inexperienced operators, there's a large curve that takes place in the first several years of operating a vehicle or doing anything, a complicated task like that. The other is with a high performance vehicle, typically these are driven a little differently. I mean, somebody that's willing to pay the extra money for the extra horsepower usually uses it. And with the combination of those two it really escalates the risk considerably.

The policyholder and the other defendants strenuously argue that the misrepresentation on the initial application did not increase the risk of loss *at that time* because the 14-year old great-grandson was not then age-eligible to drive and there is no evidence that he was driving illegally. This contention misses the broader interest of the insurance company in identifying *and* then tracking into the future young residents of a household. The significance of this in the instant case is clear: had the policyholder divulged the identity of the 14-year-old in her household in 1995, the insurance company would have been in a position to hold this information in suspense so it could check on him in the future to determine if he was a driver, or soon-to-be driver, in the policyholder's household. Had this happened, the issue of coverage for the great-grandson could have been addressed directly between the parties and, if coverage was desired and the insurance company was amenable, an appropriate premium could have been charged.

We recognize that the initial six-month term that began in December, 1995, had long since passed at the time of the accident in this case; but the six-month term that was in effect at that time was nothing more or less than a renewal of the initial policy. As such, it was tainted by the misrepresentation in 1995 – a misrepresentation that continued to form a part of the basis of the insurance contract in this case.

-15-

We conclude, as a matter of law, that the matter misrepresented by the policyholder was "of that character which the court can say would reasonably [have] affect[ed] the insurer's judgment." *Volunteer State Life Ins. Co. v. Richardson*, 146 Tenn. 589, 606, 244 S.W. 44, 49 (1922).

The policyholder and the other defendants argue that even if she never informed the insurance company of the great-grandson's presence in her household, the insurance company had information that, if pursued with reasonable diligence, could have led it to the truth of the matter. We disagree.

Witnesses for the insurance company testified in certain and unequivocal terms that had the policyholder, during her two phone calls to the agency, informed those who answered her calls as to her identity, that she was a policyholder, and that she had a child of the great-grandson's age in her home, those individuals would have noted these facts in their records. If such had been the case, according to the testimony, the policyholder's premium would have been adjusted upward to reflect the increased risk of a young driver in the household. We find that the evidence preponderates in favor of a finding that the policyholder never provided her name or status as an insured when she contacted the agency with the inquiries mentioned earlier in this opinion. Based upon this evidence, we conclude that the policyholder never gave the insurance company any information that could have led it to discover the true facts regarding the great-grandson's presence in her household.

Considering the totality of the evidence, we conclude that the evidence preponderates in favor of a finding that the policyholder misled the insurance company at the time she initially acquired the policy and that she never corrected this misinformation at any time prior to the collision that resulted in the great-grandson's death.

We therefore conclude that the policyholder's misrepresentation to the insurance company was material to the risk undertaken. Under the controlling statutory language, the misrepresentation in this case voids the policy *ab initio* and thus the insurance company cannot be held liable for damages related to the collision.

XI.

We also hold that the failure of the policyholder to advise the insurance company of the great-grandson's presence in her household when she made her initial monthly premium payment in connection with the various renewals up to and including the last renewal effective June 5, 1999, constitutes a misrepresentation under Tenn. Code Ann. § 56-7-103. "While the statute expressly refers to written or oral misrepresentations, the statute has also been interpreted to cover material omissions, such as when the insured withholds information which the insurance company has requested." *First Tennessee Bank Nat. Ass'n. v. US Fidelity & Guar. Co*., 829 S.W.2d 144, 147 (Tenn. Ct. App. 1991). It is abundantly clear that the insurance company was interested in, and at the time of each renewal requested information about, residents of the policyholder's household 14 years of age or older. The preponderance of the evidence is that the policyholder was aware of these requests. Her own testimony establishes that she made a conscious decision to withhold information

about the great-grandson in order to avoid the higher premium she knew would be charged by the insurance company when it learned of his presence in her household. Unlike the conclusion reached by us following our analysis of the policyholder's conduct at the time she initially purchased the policy, we find that the evidence preponderates that this information was withheld by the policyholder "with actual intent to deceive." *See* Tenn. Code Ann. § 56-7-103. Accordingly, while there is no requirement under the statute that there be a showing of an increased risk of loss as a result of the intentionally-undisclosed information in order to render the nondisclosure material, nonetheless, for the reasons previously stated, we find abundant evidence of such an increase.

"[I]t should be noted that a contract of insurance is one requiring utmost good faith on the part of an insured and insurer." ***Tallent v. Tennessee Farmers Mut. Ins. Co.***, 785 S.W.2d 339, 340 (Tenn. 1990). "[T]raditionally, courts have considered insurance contracts to be '*uberrimae fidei* [requiring complete good faith, with no concealment] and a failure by the insured to disclose conditions affecting the risk, of which [the insured] is aware, makes the contract voidable at the insurer's option.'" ***First Tennessee Bank Nat. Ass'n.***, 829 S.W.2d at 147 (quoting ***Stipcich v. Metropolitan Life Ins. Co***., 277 U.S. 311, 316, 48 S. Ct. 512, 513, 72 L.Ed. 895 (1927)).

## XII.

Having determined that the policy is void *ab inito* due to material misrepresentations, we direct the trial court, on remand, to hold a hearing to determine the premium payments for which the policyholder is entitled to be reimbursed.

## XIII.

The judgment of the trial court is reversed. This case is remanded to the trial court for further proceedings and for the entry of an appropriate order, consistent with this opinion. Costs on appeal are taxed to the appellees.

_____
CHARLES D. SUSANO, JR., JUDGE