**ROYAL SURPLUS LINES INSURANCE CO.,**
Plaintiff,

**The Insurance Company of The State of Pennsylvania and New Hampshire Insurance Company, Intervening Plaintiffs,**

v.

**SOFAMOR DANEK GROUP, INC., Defendant.**

No. 97–2499.

United States District Court,
W.D. Tennessee,
Western Division.

July 2, 2003.

---

Michael B. Neal, Armstrong Allen, PLLC, Memphis, TN, Linda J. Mowles, David L. Beck, Michael S. Pemberton, Lewis King Krieg & Waldrop, P.C., Knoxville, TN, Aaron Wyckoff, Lewis King Krieg Waldrop & Catron PC, Nashville, TN, for Plaintiff.

William C. Bateman, Jr., Esq., Scott B. Peatross, Esq., Bateman Gibson & Childers, Memphis, TN, William P. Kardaras, Esq., Peter W. Kardaras, Cooper Kardaras & Kelleher, New York City, for Intervening Plaintiffs.

Lee J. Chase, III, Esq., Larry Montgomery, Esq., Glankler Brown, PLLC, Memphis, TN, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON VOIDNESS ISSUE

JULIA SMITH GIBBONS, Circuit Judge, Sitting by Designation.

This declaratory judgment action presents the issue of whether plaintiff Royal Surplus Lines Insurance Company ("Royal") and intervening plaintiffs The Insurance Company of the State of Pennsylvania ("ISOP") and New Hampshire Insurance Company ("NHIC") are obligated to pay claims and defense costs associated with orthopedic bone screw litigation under policies of insurance they issued to defendant Sofamor Danek Group, Inc. ("SDG"). A principal issue in the case is whether the Royal policy is void from its inception based on misrepresentations and omissions allegedly made by SDG in procuring the policy. The court bifurcated this issue from the remaining issues in the case and elected to try it prior to trial on other issues. After carefully considering all of the evidence presented to the court in the bench trial on the voidness issue and applicable law, the court makes the following findings of fact and conclusions of law on that issue.

### I. FINDINGS OF FACT

Royal is a Connecticut corporation with its principal place of business in North Carolina. SDG is an Indiana corporation with its principal place of business in Memphis, Tennessee, in the Western District of Tennessee.

SDG is a manufacturer and seller of internal fixation devices for use in the spine, including orthopedic bone screws. After a "20/20" television program segment in December 1993 suggested that bone screw use was dangerous and not approved by the Food and Drug Adminis-

tration ("FDA"), many products liability lawsuits were filed against SDG and other bone screw manufacturers in both state and federal courts. SDG was first named as a defendant in January 1994 in a proposed nationwide class action filed in federal court. The Judicial Panel on Multidistrict Litigation ("MDL") centralized the federal cases in the Eastern District of Pennsylvania, in a docket styled *In Re Orthopedic Bone Screw Products Liability Litigation MDL 1014* and presided over by United States District Judge Louis C. Bechtle. The cases alleged that SDG's bone screws were defective and also alleged that SDG and other companies had illegally promoted bone screws for use in pedicle screw fixation of the spine in violation of FDA regulations.

SDG determined to defend the lawsuits vigorously. It retained the Philadelphia law firm of Pepper Hamilton LLP to represent it in the initial federal class action in which SDG was named as a defendant. Pepper Hamilton ultimately became national counsel for SDG in all the bone screw litigation. The Pepper Hamilton partner in charge of the representation was Stephen S. Phillips, and Deborah Cohen, another Pepper Hamilton lawyer, also participated actively in the defense.

As the MDL docket progressed before Judge Bechtle, a number of important developments occurred. On February 22, 1995, Judge Bechtle denied the request for class certification. While this was a major victory for SDG with the potential for significant long-term reduction in the number of claims, it meant that many new lawsuits by individual plaintiffs were likely to be filed in the near future. On July 7, 1995, Judge Bechtle directed that discovery proceed on all issues in the MDL cases so that the cases would be ready for remand and trial within a short time-frame. At that same time Judge Bechtle also told the parties that defendants should promptly file any potentially dispositive motions that would affect a significant number of cases. At the time of the July 7 ruling SDG was a party to about 500 cases in the MDL docket. A result of the ruling was an immediate increase in the burden of defending the MDL proceeding.

During 1993–94 and 1994–95 SDG had products liability insurance under towers of insurance for approximately $20 million. The 1994–95 policies were to expire on October 24, 1995, but SDG obtained an extension of these policies until November 24, 1995.

Royal, a surplus lines insurance carrier, issued Commercial General Liability policy number KHA 009773 ("Royal policy"), the policy that is the primary subject of this case, to SDG for the period November 24, 1995, to November 24, 1996. The Royal policy was a "claims-made" policy, meaning that it covered claims made within the policy period. The policy indemnity limit was $1 million, but this limitation did not apply to defense costs, which were covered outside the limits. The policy included a Products Liability "Retained Limit" Endorsement providing for a self-insured retention ("SIR") of $1.5 million, with defense costs included within the retention amount. SDG paid a total premium of $615,784.00 for the policy. Calculation of the premium was based on sales of covered products, and bone screw sales were included in the premium calculation.

ISOP issued a policy to SDG in excess of the Royal policy, and NHIC issued a policy to SDG in excess of the ISOP policy. Both were "follow-form" policies, meaning that the policies follow the terms and conditions of the underlying policy. The ISOP policy was for $4 million in coverage in excess of the SIR and the Royal $1 million indemnity, with expenses within the limits. SDG paid a total premium of $597,617.00 for the ISOP policy. The

NHIC policy was in excess of the SIR and the Royal and ISOP policies. It had a $15 million liability limit, with expenses within the limit. SDG paid a total premium of $440,000.00 for this policy.

The negotiations preceding issuance of the Royal policy are of critical importance in resolving the voidness issue. In the summer of 1995, SDG became aware that Home Insurance Company, its primary insurer for the past two years, would not renew or provide further coverage for SDG. SDG anticipated going to the surplus lines market, which handles more difficult risks, to negotiate a policy. Mark Merrill was the SDG vice-president with responsibility for risk management.

SDG's retail insurance broker was Sedgwick James of Tennessee, Inc. ("Sedgwick"). Douglas Pera and Mark Forrester were the Sedgwick employees who worked on the SDG account.

Surplus line insurers are approached only through wholesale brokers. Tri–City Brokerage, Inc. ("Tri–City"), which procured $270 million in premium business for Royal between 1988 and 1995, was the wholesale broker for Royal and as such was Royal's agent in connection with the negotiation and binding of the Royal policy.[1] Peter Scott was the Tri–City employee involved in the negotiations.

The underwriter for the Royal policy was James Dixon of Royal Specialty Underwriting, Inc. ("RSUI"). Dixon was chairman of RSUI, a specialty division of Royal Sun Alliance Insurance Companies.

RSUI underwrites risks which Royal, also a part of the Royal Sun Alliance, assumes. At the time of trial, Dixon had over thirty years experience in the insurance industry, with much experience in underwriting very high product risks. He is a chartered property and casualty underwriter. Although Dixon was the primary person negotiating the policy for Royal, Lewis Chamberlain, an experienced assistant underwriter, handled a key phone call.

In seeking new coverage for SDG, Sedgwick assembled a voluminous group of documents known as the submission. Among other documents, the submission included an undated six-page document entitled "Details of Bone Screw Litigation" ("the narrative") and a September 28, 1995 letter from SDG's General Counsel, Richard E. Duerr, Jr., to Pera.

The narrative first outlines the origin of the bone screw litigation through the "20/20" segment and subsequent advertising by plaintiffs' attorneys for prospective class members. The second paragraph states that, "The resultant publicity led to a number of individual suits as well as two requests for class certification."[2] That same paragraph notes the targeting of SDG as the dominant manufacturer in the industry. After a passing reference to the denial of class certification in the MDL docket in the third paragraph, the narrative turns to a discussion of the merits of the claims, with SDG taking the strong position that the claims lack merit.

---

**1.** Royal asserts that Tri–City was not its agent. This argument is based on the agreement between Royal Specialty Underwriting, Inc., ("RSUI") and Tri–City, which recites that Tri–City is not RSUI's agent and cannot bind it, and the testimony of James Dixon of RSUI referencing that agreement and noting that a retail broker such as Sedgwick receives part of the commission paid to the wholesale broker by the insurer. The agreement between RSUI and Tri–City and any agreement between Tri–City and Sedgwick to split commission cannot alter the nature of the relationship. In addition to the facts of the entire negotiation process, other facts pertinent to this issue include Royal's payment of Tri–City's commission and Tri–City's issuance, with Royal's authorization, of the binder obligating Royal to insure SDG.

**2.** One request was in the MDL docket; the other was in state court.

On the third page the narrative turns to a report on the status of litigation and claims and "positive developments that have occurred over the course of the past year." It refers again to the denial of class certification in the MDL docket and expresses a view that this ruling eliminated many potential claims. It discusses efforts to encourage claimants to assert their claims in the MDL proceeding and other efforts to maximize efficiency in defending the MDL claims. In connection with the efficiency discussion, it states, "We expect to have a fairly good picture of the total number of claims which will be asserted against Sofamor and Danek in the federal system by the middle of September." The narrative also covers the status of discovery, Judge Bechtle's case management order, and preemption issues. It lists various positive events relating to the litigation, including the fact that there had been no adverse rulings or decisions as to any of the manufacturers.

On its last page the narrative gives the key deadlines, called "a timetable of events over the next few months," with the first date listed being September 15, 1995 and the last date being May 1996, when the cases would be ready for trial. The narrative concludes with the observation:

> With the accelerated filing schedule required by the court, it is anticipated that the expenses associated with this litigation will skyrocket for the next three to four months. Should a successful ruling come out of the MDL, then "pedicle" screw issue could effectively be dead.

The narrative's contents support a finding that SDG prepared it in the summer of 1995. Certainly, its reference to the upcoming timetable with September 15 as the first date indicates a probable preparation date of some weeks prior to September 15.

The September 28, 1995, three-page letter from Duerr to Pera recites its purpose of helping the reader to assess SDG's exposure in the bone screw litigation. It notes that SDG is a defendant in approximately 760 cases, most of which are a part of the MDL proceeding. It describes the substance of the claims in the case as being sale of a defectively designed or manufactured product and sale of bone screws in violation of FDA marketing and labeling restrictions. It states the legal basis for pending partially dispositive motions in the MDL proceeding and notes that no cases involving SDG have been tried.

The remainder of the letter is an effort to evaluate exposure and future events. This portion of the letter reads in its entirety as follows:

> Against this backdrop, it is difficult to forecast the Company's overall exposure with any certainty. Nonetheless, a number of generalizations can be made which are useful in assessing the Company's exposure. Those plaintiffs who have yet to experience any instrumentation breakage or failure should be viewed as having questionable causes of action. Even if they succeed in establishing one or more causes of action, the damage potential of their claims should be fairly small, if not nominal. We believe the majority of the claims to date fall in this category. Claims of individuals who have experienced instrument breakage could involve great damage potential but will be more difficult to dismiss without well-developed records. We are still early in the process of developing those records. Nonetheless, the plaintiffs in these cases will have to overcome the preliminary legal challenges listed above. While there is more damage potential for individuals who have experienced broken hardware, device breakage is relatively rare and is a risk that is generally explained to patients prior to surgery (as is the possibil-

ity that the surgery will not relieve the patient's back pain or possibly even make it worse). Accordingly, while we are not, at this point in time, able to quantitatively evaluate these claims, it would be reasonable to assume that there will be relatively few instances of severe exposures where the plaintiffs can establish viable causes of action.

It is equally difficult to project the number of cases that will be filed in the future. We believe that the future number of cases will be determined, in large part, by Judge Bechtle's decision on many of the dispositive motions. As mentioned above, most of the complaints do not allege any failure or malfunction of the construct that the doctor created in performing the spinal fusion surgery on a particular plaintiff. If Judge Bechtle determines that unless there is a failure or a malfunction of a construct, there is no cause of action (and there is a wealth of case law to support this proposition), the vast majority of the cases should logically go away. Moreover, if the judge grants our motion for summary judgment on the basis of the defense of federal preemption, additional cases will either go away or will be significantly narrowed in scope. We also believe that there are a number of individual plaintiffs who have statute of limitations problems and whose cases are appropriate for dismissal on that ground. Not only should the forgoing result in a reduction in the number of cases, it would, in our opinion, take away the financial incentive that the plaintiffs' attorneys envision with this litigation.

Projecting defense cost suffers from some of the same difficulties—the lack of a reliable experience base. Nonetheless, we have the benefit of the 21–month history of this litigation. Through August, the Company has expended a total of over $5,000,000 in the defense costs. This averages approxi-

mately $275,000 per month, although there has been a recent spike in defense costs due to Judge Bechtle's ambitious discovery schedule. While the Company anticipates expending at least $600,000 per month for the next several months, there are a number of reasons why it is not likely that the amount will remain at such levels for an extended period of time. First, both the federal and state courts will soon be rendering a number of decisions which will go a long way to shape the future of this litigation. Second, while we have been told by the plaintiffs' attorneys that they intend to assert a number of additional claims, they have not yet done so. We believe that many plaintiffs' attorneys do not wish to invest the time or money necessary to file claims until Judge Bechtle rules on the defense of federal preemption and the more than ten (10) other dispositive motions. In addition, the FDA has been considering down-classifying the labeling requirements for bone screws for some time. If and when the Agency acts, we believe that plaintiffs will lose much of their incentive to assert future claims. How all these events will coincide is impossible to predict, but we are currently optimistic that they will collectively result in an overall reduction in the number of cases and in defense costs.

In addition to the statements in the submission that the defense costs for the bone screw litigation to date were approximately $5 million, the submission included information that $3,598,735.55 had been spent and charged to the 1993–94 policy year and that $582,382.03 had been spent and charged to the 1994–95 policy year. The submission noted that these amounts were all expenses because no indemnity had been paid. The representations about

expenses were all accurate at the time they were made.[3]

Another item included with the submission was an unsigned and undated Repath Associates products liability application form, which included an application warranty on its last page. Royal did not request or supply this form. This form contained a section (question 16(A)) requesting loss history information for the last five years. Loss history information for prior years was attached to the form or otherwise included in the submission. The form also included question 16(B) which asked whether the applicant was aware of any incidents not yet reserved that might result in claims against it. The response was "no." Question 16(C) asked whether any insurance company or underwriter had ever refused to issue or cancelled the applicant's products public liability insurance. The response to this question was also negative.

Sometime in the fall of 1995, Agricultural E & S, an excess carrier for SDG, cancelled its policy. The reason for cancellation was the excess carrier's concern about the financial status of the primary carrier. The coverage was immediately assumed by another carrier. This information was not included in the submission or otherwise provided to Royal.[4]

In early October 1995 Sedgwick sent the submission to Scott at Tri–City. Forrester's undated cover letter includes brief historical information, states that $5 million had been spent defending the claims to date and notes that while class certification had been denied, individual suits were "dragging on." It refers to inclusion of information about two recent rulings in addition to the submission. It explains that Home Insurance Company, SDG's primary carrier for several years, had refused to renew, but had extended coverage to November 24, 1995. It relates the primary carrier's view that it would pay another policy limit for the 1994–95 policy year.

On October 17, 1995, Tri–City forwarded the submission to Royal.[5] Scott's cover letter to Dixon noted that it included "application, loss information, financial and products brochures." The letter recites information about SDG's business and total and per year expenditures on the bone screw litigation, includes information about the refusal to renew, past claims and the terms sought for a new policy (specifically, limits of $20 million excess of a SIR of $250,000 with an aggregate of $1.5 million).

Royal has taken the position in this litigation that the submission sent to it by Tri–City did not include the letter from Forrester to Scott. This position is not supported by any affirmative testimony that the letter was not received. Dixon did not recall whether or not he had it during the underwriting process. Rather,

---

3. They did not, however, include amounts not yet billed to SDG for defense costs for time periods prior to inception of the Royal policy. The ultimate general MDL defense costs for periods prior to the policy issuance included average billings from Pepper Hamilton for $700,000 a month from July to November 1995. The litigation expenses ultimately exceeded $1 million for August 1995, approached $2 million for October 1995, and exceeded $2 million for November 1995.

4. The court includes the information about cancellation because Royal presented evidence about the application form and the cancellation issue at trial. Based on the proposed legal conclusions submitted by Royal in its proposed Findings of Fact and Conclusions of Law, Royal does not seek to void the policy based on SDG's failure to disclose this cancellation. Therefore, this proof has little or no significance.

5. The parties stipulate that the submission materials were sent by Tri–City to ISOP and NHIC on that same date.

Royal urges that the Bates stamp numbers on the copy of the letter obtained from Royal's underwriting file indicate that the copy was sent to Royal by counsel in October 1996. The Bates stamp numbers do suggest that Royal's copy may have been enclosed with the October 1996 letter of counsel. On the other hand, a Bates stamp number, strictly speaking, indicates only what number was stamped on the document during discovery. The fact that the document was in the Royal underwriting file may in and of itself permit an inference that Royal received it with the submission. In any event, resolution of this issue is unnecessary. The letter from Forrester to Scott did not include any pertinent information not furnished to Royal in other materials included with the submission or in Scott's letter to Dixon.

Royal received the submission around October 18, 1995. Dixon, Royal's president and the underwriter on this risk, informed Tri–City by fax of October 23 that the risk was "too tough for [him] based on the class action suit and continuing expenses related to is [sic]."

In the course of seeking new coverage for SDG, Sedgwick had approached Med-Marc, another potential insurer. Med-Marc had proposed a Designated Products Exclusion that would exclude from coverage bone screws for attachment to the spine "that were not part of an FDA-approved investigational device exemption study, and were promoted (including, but not limited to, labeling, advertising, training) for a use not approved by the FDA." Sedgwick forwarded this proposed exclusion language to Tri–City.[6]

On October 23 Tri–City faxed the Med-Marc exclusion language to Dixon. Dixon responded by fax, saying, "I do have some

interest, but likely xs of 500,000 SIR/1,500, 000 aggregate."

On November 1 Dixon sent another fax to Tri–City indicating that Royal would provide coverage with defense costs outside the policy limits. SDG did not ask that expenses be outside the policy limits, and this provision was not discussed during the policy negotiations. Putting expenses outside the limits was Dixon's normal practice in underwriting a policy.

In the November 1 fax Dixon requested a list of all claims or incidents since January 1, 1986, by name of claimant and date of loss. He also stated, "It is our intent not to cover any of the class action losses tied to the bone screw failure currently litigated as well as bone screws as described in the designated products exclusion. This should be the same-but I want to be clear on this point."

SDG wanted coverage for off-label bone screw use, although it was willing not to be covered for any off-label use that it promoted. Consequently, in response to the November 1 fax, Forrester sent a memo to Tri–City, which Tri–City forwarded to Royal. The memo stated: "The MedMarc wording I sent is not intended to exclude all claims surrounding the pedical (sic) screw but only those claims in which it is determined that the insured promoted the product for 'off-label' or non-FDA approved usage. Sofamor can tell the docs what the product is used for and what it is not used for but they can't keep them from using it in any manner they deem necessary which is in the best interest of the patient. This is the intent of the Medmarc wording."

Dixon responded by fax on November 15, saying: "Royal's intent is not to ex-

---

6. A handwritten note describing MedMarc's position was not sent to Tri–City. Neither the content of this note nor the failure to send it to Tri–City is relevant to the resolution of this case, in which MedMarc's views are not at issue.

clude all claims surrounding the pedical [sic] screw, but only those claims in which it is determined that the insured promoted the product for 'off-label' or non FDA approved usage. We also don't intend to cover any subsequent claims from any current class actions known by our insured."

On November 16 Tri–City faxed to Royal SDG's proposed wording for the designated products exclusion. SDG proposed excluding bone screws "that were not part of an FDA-approved investigational device exemption study, if they are proven by a final judgment against the company to have been promoted by the company in the U.S. for a use not approved or cleared by the FDA."

Dixon's response by fax of November 16 noted that he had a problem with the "proven by final judgment" language. He offered Royal's preferred wording as excluding bone screws if they "were not part of an FDA-approved investigation device exemption study or were promoted by the company in the U.S. for a use not approved or cleared by the FDA."

On November 20 Tri–City sent Royal a fax requesting a conference call on several subjects, including the use of the word "or" in Royal's November 16 proposal. This use represented a fundamental change from the MedMarc proposal. The fax also requested, "can you allow insured 14 days to provide list of claimants."

The requested conference call occurred on November 21. Royal's representative in the call was Chamberlain; Dixon did not participate. Chamberlain was authorized to handle Dixon's files when Dixon was unavailable and had done so in the past. Chamberlain was prepared for the call and knew that the "and" to "or" change would be discussed. Pera, Forrester and Merrill all participated in the call on behalf of SDG. Merrill consulted with Cohen during the call, a fact of which Royal was unaware. Scott participated for a short time.

During the call SDG asked Royal to agree to the use of "and" rather than "or." Merrill explained that SDG could not control a physician's off-label use of a bone screw. For this reason, he noted, the designated products exclusion should exclude only bone screws used off-label *and* promoted by SDG for an off-label use. SDG thought the "and" language was consistent with Dixon's intent, based on his November 15 fax.

Chamberlain orally agreed to the use of "and." He too believed this language was consistent with Dixon's intent and discussed it with him later. The agreement was confirmed by a November 21 fax from Chamberlain to Sedgwick stating "Agreeable to substitution of 'and' for 'or' in the specific products exclusion."

Chamberlain testified that he believed Dixon intended to exclude the "historical bone screw litigation" through the designated product exclusion and that he communicated this intent to other participants in the phone call during which he agreed to the change to "and" from "or."

Between October 17, the date the submission was sent to Royal and the date of issuance of the policy, SDG received over 2000 additional claims. New claims were entered into a database at Pepper Hamilton. Although SDG had some rough figures with respect to claims numbers,[7] it is unclear at exactly what point SDG knew the precise number. In any event, the evidence clearly demonstrates that SDG

---

7. One source of these rough numbers was a Sedgwick representative, Charles Kashen, who reported to Duerr by November 6 letter that, in a meeting the prior week, he had heard figures of 3000 new claims, with 1600 received in the past week. In a November 10 meeting, Duerr heard figures of 2335 gross new claims as of November 3 and 1817 as a net number for that same date.

knew the approximate number of new claims before the policy was issued.

During the November 21 call Merrill asked for an additional fourteen days within which to furnish the list of claimants and dates of loss requested by Dixon on November 1. Merrill and Pera explained that there were a significant number of new claims. At that time they were not aware of the estimated figures of 1600 to 3000, which had been furnished to Duerr, and they did not mention any specific number of claims or dates of filing. Chamberlain admittedly agreed to the additional time, but denies that he was told anything about new claims. He does concede knowing that the basis for the requested extension was logistical problems in putting together the list. Although all three witnesses—Merrill, Pera and Chamberlain—have strong reasons to recall a version of the conversation that is advantageous to a particular party's[8] litigation position, the court finds Merrill and Pera to be the more credible witnesses on this point. Merrill, Pera and Chamberlain all agree that the extension was requested and granted and that some discussion about the need for it occurred. It seems likely that the conversation included the sort of low-key, casual mention of new claims that Merrill and Pera described.[9]

At no time during the policy negotiations did SDG, Royal or their agents discuss allocation of general defense costs[10] among insurers. SDG did not advise Royal that insurers for the two previous policy years had agreed to a sharing of general defense costs and an allocation method.

Dixon did not conduct any independent investigation with respect to the risk involved in insuring SDG and asked few questions. He testified that the submission was sufficient for him to analyze the risk and issue a policy. He understood that he was insuring an extreme risk. Despite this testimony, Dixon also testified that he thought the designated product exclusion excluded all bone screw claims.

Royal issued the policy on November 24, 1995. The designated products exclusion contained the word "and" as discussed and agreed upon in the November 21 phone call. The policy was bound "subject to" Royal's receipt of the claims list within fourteen days. Royal could terminate coverage if the claims list provided information different from that previously provided or reflected an unacceptable risk.

Sedgwick later asked Royal for an additional seven days to furnish the list. The extension was necessary due to the time required to input new claims into the Pepper Hamilton database and Sedgwick's determination that Pepper Hamilton's initial printout of everything in its database (several thousand pages) did not accommodate Royal's request. Royal agreed to a December 15 deadline. Pepper Hamilton sent Tri-City the 165–page list of claimants and dates of service of each claim by overnight carrier on December 13. Tri-City forwarded the list to Royal on December 14.

The list included claims filed subsequent to the date of the submission, and there is no dispute about its overall accuracy. Royal raised no issue about the substance

---

8. Merrill is still employed by SDG, while Chamberlain is still an underwriter for Royal. Pera still works for Sedgwick, which had an agency relationship with SDG.

9. This finding is reinforced by Royal's failure to react in any way when it finally received the list on December 14. Royal's conduct

strongly suggests that it was not surprised, although it is possible that its lack of surprise was solely attributable to predictions of new individual claims in the submission.

10. General defense costs are those benefitting the overall litigation and not associated with a particular individual's claim.

or timeliness of the list until the filing of this lawsuit, other than to ask a single question about the absence of one claimant from the list. It did not take any steps to terminate coverage. Royal also never claimed any failure to disclose claims numbers misrepresentation by SDG until sometime after June or July 1996, when its current counsel assumed representation of Royal.

Royal issued a first reservation of rights letter to SDG on February 16, 1996, and a second reservation of rights letter on December 16, 1996. ISOP and NHIC also issued reservation of rights letters. The parties stipulate that SDG provided product liability billing submissions to its insurers.

Royal has argued that evidence about events in 1996 is relevant to the voidness issue. Generally, this evidence includes (1) proof that additional bone screw cases were filed against SDG and sent to Royal after the inception of the policy period, a total of 258 before February 1996, (2) proof that cases based on a conspiracy theory were filed during Royal's policy period, yet Royal was not advised of this new theory,[11] (3) the February 16, 1996, letter from Royal to SDG reserving its rights and taking the position that the suits were excluded from coverage, (4) a March 5, 1996, letter from SDG to Royal requesting a meeting, (5) testimony about the requested meeting, which occurred on April 3, 1996, at which SDG reviewed the status of the litigation and informed Royal that general expenses were being allocated fifty-fifty between the two previous policy years, (6) testimony about meetings in June[12] and July 1996 at which allocation of general expenses was discussed, including testimony about a July meeting at which Merrill proposed a three-way split of general expenses beginning with the inception of the Royal policy. Although this evidence is either totally irrelevant or, at best, only marginally relevant in the case, as will be explained later in this opinion, the court allowed Royal to present it. Exhaustive review of the evidence of events in 1996 is not necessary, however.

Royal argues that the policy is void *ab initio* based on a number of alleged material misrepresentations and omissions by SDG that Royal contends increased the risk of loss. These include (1) failure to disclose an intent to allocate general expenses to Royal, (2) misrepresentation as to the amount of legal expenses incurred, (3) failure to disclose the number of claims, (4) misrepresentation as to the impact of the designated products exclusion, (5) misrepresentation as to the status of the bone screw class action, and (6) violation of the application warranty by the above misrepresentations and omissions. The parties introduced expert testimony relating to the obligations of SDG and Royal with respect to the negotiation process and the materiality of various representations.

Royal presented the expert testimony of Peter R. Kensicki, Professor of Insurance for the last eleven years at Eastern Kentucky University. Kensicki teaches in the Department of Loss Prevention and Safety within the College of Law Enforcement. He has a Bachelor of Business Administration degree with a Major in Finance from the University of Cincinnati, as well as Master of Insurance degree and Doctor of

---

11. Defendants in the bone screw cases had discussed the prospect of conspiracy claims prior to issuance of the Royal policy, but the vast majority of such claims were apparently filed after inception of the Royal policy period.

12. After the June meeting, Merrill sent a letter to Royal showing over $5 million in unallocated general expenses and $62,315.28 in case-specific expenses for the Royal policy year.

Business Administration degrees from Georgia State University. He is a Chartered Life Underwriter, a Chartered Property Casualty Underwriter and a Fellow of the Life Management Institute.

Kensicki has been a licensed life insurance agent, worked in the Rates and Forms Division of the Georgia Department of Insurance, served as Director of Training and Education for an insurance company and worked for two educational associations that grant various certifications and designations within the insurance business. He also taught at Ohio University for a period of time. Kensicki has written several insurance books, some of which discuss underwriting to some degree.

Most of Kensicki's testimony was extremely general, dealing with the general operation of the surplus lines insurance market. Of pertinence to this case, Kensicki said that it was important that the information contained in a submission be as accurate as possible. Kensicki also emphasized the importance of updating information provided to a potential insurer. Kensicki noted that the underwriter's role is largely one of evaluating information provided to him by the prospected insured, not investigating independently. He noted that information about the number of claims made would assist an underwriter in evaluating the risk and that an underwriter would expect to be updated on a change in the frequency of claims. Kensicki also indicated that an underwriter would want to know about the expenses of defending claims and loss history.

With regard to the allocation of general expenses, Kensicki indicated that allocation of general expenses in a claims-made policy was not common in the industry. Kensicki gave an opinion that a company should provide in its submission to the underwriter information concerning whether prior year carriers had agreed to a method of allocation and to the use of general expenses. Kensicki also gave an opinion that the amount of expenses incurred by SDG suggests that the risks sought to be covered by SDG bore little relationship to and were significantly greater than the premium charged.

On cross-examination, SDG established that Kensicki's income from being an expert witness exceeded his income from Eastern Kentucky State University. Kensicki's underwriting experience was limited to writing a few car insurance and homeowners policies over twenty years ago.

Because of the general nature of Kensicki's testimony and his extremely minimal underwriting experience, Kensicki's testimony was of limited assistance in resolving the issues.

Royal also presented the expert testimony of Arthur T. Simmonds. Simmonds, who is now retired, spent his entire work life after college in the insurance business. For the last thirty-three years of his career he was with the Commercial Union Insurance Company. At the time of his retirement Commercial Union was one of the largest British composite insurers. The United States operations of the company wrote a broad spectrum of personal, commercial, business and life insurance.

When Simmonds first went to work for the Commercial Union Insurance Group, he was an underwriter in the excess and surplus lines division of the employers group. He remained directly involved in underwriting until 1968. Later, for approximately twenty years, he was the company's designated representative for Rule 30(b)(6) depositions and testified in a wide variety of cases involving underwriting matters in the surplus lines and excess coverages that the company wrote. Simmonds had not previously testified as an expert witness for any other insurance company.

Simmonds gave quite general testimony about the function of an underwriter and the underwriting process. He also testified concerning the relationship between insured and insurer. He talked about the utilization of brokers in the surplus lines business.

With regard to allocation of general defense costs under a claims-made policy, Simmonds said "I would not expect that to be a significant issue." He noted however that there was nothing wrong with utilization of an allocation of general expenses under a claims-made policy "providing the underwriter is made aware of it up front, providing the underwriter understands and can quantify the additional risks that he may be assuming and can properly price it in the quotation and issuance or the general acceptability of the risk." He indicated that allocation of general defense costs information would materially affect an underwriting decision. Simmonds indicated that it was not unusual for defense costs to be written outside a claims-made policy.

Simmonds gave an opinion that if there is an agreement between insurers for prior years to allocate general expenses, the insured should disclose that agreement to the underwriter. Simmonds appeared to understand this question to involve an agreement with respect to allocation for the policy not yet entered into, but his testimony is not entirely clear on this point. The confusion is understandable because the questions posed to Simmonds appear to assume that an agreement existed prior to issuance of the policy with respect to Royal's sharing in general expenses. Of course, no such agreement existed and in fact could not have existed without Royal's knowledge and assent. Despite the confusion, the court concludes that Simmonds in fact thinks that SDG should have disclosed to Royal the agreement of other insurance companies with

regard to allocation of general expenses for years prior to the Royal policy.

Simmonds testified that the insured has a duty to disclose all its known risks. It is important that the information provided by the insured be accurate and timely. In his view, the insured has an obligation to update any changes in information. While an underwriter has the ability to carry out an independent investigation of information submitted by an insured, the reality is that underwriters do not have time to do that.

According to Simmonds, form applications are commonly included with submission material. They contain only basic information, and a substantial amount of additional information is required. The application is "merely a communication device." A warranty is commonly included with the application forms which indicates that the information contained in the application is accurate and complete. An undated, unsigned application does not indicate that the information is incorrect or untruthful.

With regard to this case particularly, Simmonds indicated that he had reviewed the Repath application form that was part of the submission made by SDG to Royal. In regard to question 16(c), Simmonds indicated that he had been unable to find any information in the submission indicating that a prior carrier had cancelled a product liability policy. Simmonds noted that cancellation would be important to an underwriter, because cancellation relates to the acceptability of the risk. He noted that cancellation was of far more interest than nonrenewal to an underwriter.

Counsel for Royal asked Simmonds whether a filing of more than 2000 additional claims occurring after the submission but prior to issuance of the policy should be reported to the underwriter, and he responded affirmatively. Simmonds

said that this obligation exists even if the insured has provided a forecast of what might happen in the litigation.

In Simmonds' view, the fact that Dixon asked for a list of claimants and dates of loss did not eliminate the need for SDG to advise of any increase in claims activity. As a reason for his answer, Simmonds indicated that the underwriter needed a claims history for both risk evaluation and a determination of which claims were submitted within the policy period. Simmonds regarded the purpose of the December 14 letter with a list of claimants and dates of loss as more for Royal's benefit in determining whether a claim was made during the policy period than for risk evaluation purposes. Although his testimony on this point is not entirely clear, Simmonds apparently believed that Dixon was concerned only about three or four individual claims on which he needed detailed information. He apparently thought that the designated product exclusion had effectively eliminated most other claims.

On cross-examination Simmonds indicated that the phrase "products public liability insurance," referred to in question 16(c) of the Repath application is not one typically used in the industry. He is not familiar with this phrasing. Usually, in the industry, the insurance covering products liability claims is simply called products liability insurance.

Simmonds also testified on cross-examination that the letter from Forrester to Scott included with transmission of the submission materials was in Royal's underwriting file when he reviewed it.

SDG presented as its expert witness John E. Macon, who retired from CIGNA Insurance Company in 1996. Macon worked for CIGNA for about thirty years. His areas of responsibility for the company included underwriting and underwriting management. CIGNA is a multi-line property, casualty, health and life insurer, which had over $18 billion in sales at the time Macon retired. Although CIGNA is not a surplus lines insurance carrier, Macon has experience dealing with surplus lines risks and is familiar with customs and practices of underwriting in regard to surplus lines risks within the insurance business. He had never testified as an expert witness prior to this case.

Macon identified Royal Surplus Insurance Company as a surplus lines insurer, i.e., "a company that enjoys freedom of rating form and seeks to attract unique, unusual, one of a kind, difficult to insure type customers."

Macon described the underwriting process as a "proactive process led and directed by an underwriter, the purpose of which is to collect and analyze facts about the customer in order to assess the risks, exposure to loss, and develop a price and a program for that exposure to loss." In his opinion, the underwriter is not merely an evaluator of information. The underwriter needs to seek to understand as much as he can about the prospective insured. This includes devising questions to use in forming an opinion and contacting the customer directly when possible. The underwriter ordinarily considers detailed information about the company and its management, including its loss history and financial history. An underwriter has the duty to ask whatever questions the underwriter might feel appropriate, if matters are not provided with the submission. The underwriter fails to ask questions or to read sections of the submission at his own peril, according to Macon.

Macon gave an opinion that the utmost good faith standard does not apply to an insured making an application to an underwriter in a surplus lines market. Instead, a standard of trust applies. The prospective insured trusts that the company is expert in what it does, knows how to evalu-

ate exposures to loss, and knows how to construct programs that are viable for the insurer as well as the customer. The insurer trusts that, when asked to do so, the prospective insured will fairly and accurately answer the questions put to it.

In Macon's view, an increase in the number of claims is not material in and of itself. More information would be necessary to determine the importance of a claims increase.

Macon testified that Dixon undertook no investigation of the underwriting of the SDG risk. From this Macon assumes that Dixon felt there was no need to ask further questions. He described the submission made by SDG as "excellent in its detail." Macon said the submission as a whole exceeded the standards that would be expected from an insured by an underwriter. In his favorable description of the submission, Macon noted that reference to the difficulties facing SDG in the bone screw litigation appeared in the first sentence of the Duerr letter. Information about the difficulties was discussed openly and thoroughly at the beginning and throughout the submission material. Macon noted that the submission included information about prior expenses associated with the litigation and also information about future expenses. There was complete information about the status of litigation and its expected future.

With regard to the information in the submission about the number of claims, Macon noted that the submission itself said there were already 760 claims and that that number was expected to increase dramatically in the near future. The list of claims and dates of loss, in his view, was an effort by Dixon to have a catalog of claims that would not fall within the Royal

policy period. Macon noted that, upon receipt of the list, Dixon took no action and did not exercise any of the options available to him within the "subject to" provision of the binder. Given the information that was provided to Royal, specific information in late October or early November about additional claims was "not necessarily" material. Macon's opinion is that SDG complied with the required standard in disclosing information in regard to the number of claims it had experienced and was experiencing. Macon believes that SDG adequately disclosed the number of bone screw claims it was facing and likely to face, even if Merrill did not tell Chamberlain that there were significant new claims. The basis for this opinion is the lack of any reaction from Royal when it received the requested list of claims and dates of loss.

With regard to expenses, Macon indicated that the disclosure with regard to past and future expenses by SDG comported with the standard of care expected of a prospective insured engaged in an underwriting process. With regard to the allocation of general expenses applicable to one or more policy periods, Macon noted that that was not an issue of concern for an underwriter in the situation of Royal. Macon explained that an underwriter has to assume that he will pay 100% of the claims costs that fall within the policy period. If his company is able to share costs with another insurer, it is typically advantageous to the insurer. The Royal policy includes a provision concerning the sharing of expenses.[13] The language of the policy is a standard printed form provision.

Macon also indicated that it was not necessary for SDG to make a further disclosure to Royal concerning expenses

13. This provision does not relate specifically to the sharing of general expenses with insurers who provided coverage in years other than the 1995–96 policy year, the issue which

Royal contends SDG misrepresented, but rather appears to address allocating losses among insurers with policies in effect at the same time.

when the defense costs incurred in the fall of 1995 were substantially in excess of $600,000 per month. The reason for this opinion was SDG's prediction as to the increase in expenses, an increase which was in accord with what in fact occurred.

Overall, Macon's opinion was that the information provided by SDG was sufficient to permit Dixon to perform appropriate underwriting with respect to its coverage.

Finally, Macon indicated that Sedgwick was the retail broker or agent who represented SDG in connection with the policy negotiation. Tri–City, the wholesale broker, was the agent of Royal.

On cross-examination, Macon was asked a factual question concerning the absence of disclosure of cancellation of a policy in SDG's submission. On redirect, Macon indicated that the cancellation of a policy and its immediate replacement by another insurer without interruption of coverage was "not particularly" material to an underwriter. While certainly the cancellation would mean that a company wanted to cease coverage, the replacement meant that another company was willing to assume the coverage. The cancellation and replacement simply reflect two different opinions by insurance companies, with no effect on coverage for the customer.

## II. CONCLUSIONS OF LAW AND ANALYSIS OF THE EVIDENCE

As the parties agree, the court has jurisdiction over this matter under 28 U.S.C. § 1332. Because jurisdiction is based on diversity of citizenship, state substantive law is controlling. *See Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties agree that Tennessee law applies.

■ Royal argues that because SDG made misrepresentations and omissions to Royal in procuring the policy, the policy is void. Tennessee Code Annotated § 56–7–103 provides:

No written or oral misrepresentations or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the assured or in his behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

Therefore, to establish a claim of misrepresentation regarding negotiations or application for an insurance policy, an insurer must first prove that the statements made in the negotiations of a policy of insurance or answers in the application were false. *See Womack v. Blue Cross & Blue Shield of Tennessee,* 593 S.W.2d 294, 295 (Tenn.1980). Section 56–7–103 has been interpreted as also covering "material omissions, such as when the insured withholds information which the insurance company has requested." *Id.* at 147. Once the insurer establishes that a misrepresentation or omission occurred, the insurer must then establish that the misrepresentation or omission was made, given, or done with the intent to deceive the insurer, or that the misrepresentation or omission materially increased the risk of loss. *See id.* Here, Royal relies on an argument that SDG's misrepresentations and omissions materially increased the risk of loss.[14] The first issue regarding wheth-

14. Although Royal also asserts in cursory fashion that SDG acted with intent to deceive, it devotes its argument to contentions that SDG made material misrepresentations or omissions that increased the risk of loss. The court therefore will not address in detail a claim that SDG acted with intent to deceive, but simply notes that the evidence does not support a finding or conclusion that SDG acted with intent to deceive.

er or not a misrepresentation was made or an omission occurred is a question of fact. *See id.* The second issue regarding whether the misrepresentation or omission materially increased the risk of loss is a question of law. *See id.*

■ The burden of proof is on Royal to establish the elements of its claims. *See McDaniel v. Physicians Mut. Ins. Co.,* 621 S.W.2d 391, 393 (Tenn.1981.) SDG claims that the proper standard of proof is clear and convincing evidence. Royal, however, contends that the standard is a preponderance of the evidence. Tennessee law does not provide clear guidance on this point.

In *Acuff v. O'Linger,* 56 S.W.3d 527, 529–30 (Tenn.Ct.App.2001), the Tennessee Court of Appeals recognized that Tennessee law is unclear on the issue of the burden of proof in cases involving fraud in the creation or formation of documents. The court did not specifically discuss Tennessee Code Annotated § 56–7–103, but did address generally the different burdens of proof that apply in actions for damages for the tort of fraud and deceit and actions involving attempts to set aside or reform a written instrument. *Id.* at 530–31. According to the court, in a tort action, the claimant must typically meet a preponderance of the evidence standard. *Id.* In an action to set aside a written instrument, however, the evidence of fraud or mistake must be clear and convincing. *Id.* Similarly, in *Dixon v. Manier,* 545 S.W.2d 948 (Tenn.Ct.App.1976), the Tennessee Court of Appeals held that "[w]ritten instruments may be reformed or voided on the ground of fraud or mistake only where such is shown by clear, cogent, convincing evidence." *Id.* at 950.

In *Hendrix v. Insurance Co. of North America,* 675 S.W.2d 476 (Tenn.Ct.App. 1984), the Tennessee Court of Appeals found that in cases involving defensive fraud, that is a claim of fraud designed to defeat a contract or deed, or a claim of fraud in the proof of loss in an insurance case, the standard is preponderance of the evidence. *Id.* at 480–81; *see also Brayfield v. Kentucky Nat'l Ins. Co.,* No. 01A01–9701–CV–00007, 1998 WL 670389, at *3 (Tenn.Ct.App. Sept. 30, 1998) (noting that an insurance company must establish a defense of misrepresentations in the proof of loss by a preponderance of the evidence). Unlike the cases discussed above, the *Hendrix* court was presented with an attempt to defeat a policy of insurance under Tennessee Code Annotated § 56–7–103. Because the *Hendrix* court specifically addressed an attempt to defeat a policy of insurance under § 56–7–103, which provides that an insurance policy can be voided if there is a misrepresentation made in either the negotiation of a policy or the application thereof, the court finds that Royal must establish the elements of its claims by a preponderance of the evidence.

■ If Royal establishes that a misrepresentation was made, it then must establish that the misrepresentation materially increased the risk of loss. Under § 56–7–103, the concept of "misrepresentation" is distinct from the concept of "increase in the risk of loss." *Gatlin v. World Service Life Ins. Co.,* 616 S.W.2d 606, 608 (Tenn. 1981). A misrepresentation made in an application for insurance increases the risk of loss if the information misrepresented is of such importance that it "naturally and reasonably influences the judgment" of the insurer in making the contract. *Vermont Mut. Ins. Co. v. Chiu,* 21 S.W.3d 232, 235 (Tenn.Ct.App.2000) (quoting *Sine v. Tenn. Farmers Mut. Ins. Co.,* 861 S.W.2d 838, 839 (Tenn.Ct.App.1993)). The court must be able to conclude that the matter misrepresented is of a character such that it would "reasonably affect the insurer's judgment." *Id.* (quoting *Volunteer State Life Ins. Co. v. Richardson,* 146 Tenn. 589,

244 S.W. 44, 49 (1922)). "It is not necessary to find that the policy would not have been issued if the truth had been disclosed. It is sufficient that the insurer was denied information which it sought in good faith and which was deemed necessary to an honest appraisal of insurability." *Id.* (quoting *Loyd v. Farmers Mut. Fire Ins. Co.*, 838 S.W.2d 542, 545 (Tenn.Ct.App. 1992)).

■ In order to determine whether a written or oral misrepresentation has been made, the court must first determine "what the insurer asked, required, or expected the applicant to represent." *Gatlin*, 616 S.W.2d at 608. Generally, insurance contracts are deemed to be *uberrimae fidei*, contracts requiring complete good faith under which the applicant for insurance must make a fair disclosure of the facts affecting the risk, of which he is aware. *First Tenn. Bank Nat'l Assoc. v. United States Fid. & Guar. Co.*, 829 S.W.2d 144, 147 (Tenn.Ct.App.1991); *see also Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 316, 48 S.Ct. 512, 72 L.Ed. 895 (1928); *Consumers Ins. USA v. Smith*, No. E2002–00724–COA–R3–CV, 2002 WL 31863300, at *12 (Tenn.Ct.App. Dec. 23, 2002). If an insured fails to make such disclosures, the contract is voidable at the insurer's option. *First Tenn. Bank Nat'l Assoc.*, 829 S.W.2d at 147. This doctrine is typically applied in cases where the insurer requests specific information from the insured and the insured misrepresents that information or conceals material information in response to such inquiry. *See id.* (noting that the court's research "failed to reveal any controlling cases in this jurisdiction involving the duty to disclose information absent a specific inquiry by the insurer"). Because most insurers require an applicant to answer questions prepared by the insurer, the duty of disclosure has been relaxed in ordinary practice. *See Collins v. Pioneer Title Ins. Co.*, 629 F.2d 429, 433 (6th Cir.

1980) (applying Tennessee law); *see also Stipcich*, 277 U.S. at 316, 48 S.Ct. 512 (noting that information not asked for by the insurer "is presumably deemed immaterial").

In *First Tennessee National Bank Assoc.*, the Tennessee Court of Appeals addressed the scope of an insured's duty to disclose information relating to insurance coverage and determined that an insured owes "a duty to [an insurer] to disclose information material to the risk which [an insurer] would not [discover] through common observation or the exercise of ordinary diligence." *Id.* at 148. This court adopted the above standard in its order denying plaintiff's motion for summary judgment on the issue of whether the policy of insurance is void *ab initio*.

■ Royal asserts that SDG made six material misrepresentations or omissions, each of which increased the risk of loss. First, Royal contends that SDG failed to disclose its intent to allocate general expenses to Royal. The evidence is clear that Royal and SDG had no discussion about allocation of defense costs prior to the effective date of the policy. The issue of allocation of general expenses arose in 1996, when Royal learned that general expenses were being split fifty-fifty between the insurance carriers for the two prior policy years. In July 1996 SDG proposed a three-way split of general expenses, beginning with the Royal policy year. From this evidence Royal argues that, during the period when the policy was negotiated, SDG had an intent that Royal would share general expenses and that this intent, as well as the expense-sharing agreement with prior carriers, should have been revealed to Royal prior to its agreement to insure SDG. This argument fails both factually and legally.

Factually, there is no evidence that SDG had any particular expectation as to Roy-

al's participation in the sharing of general expenses prior to the effective date of the policy. To be sure, SDG knew that its prior carriers had agreed to a method of sharing general expenses and was doubtless aware that the issue might arise with respect to Royal's policy year as well. SDG had no obligation, however, to educate Royal about this possibility or to predict to Royal what sort of agreement about allocation might be acceptable to other carriers.

Royal's legal argument also lacks merit. The failure to disclose information about allocation of general expenses was not material to the risk, as the testimony of SDG's expert, Macon, illustrates. Macon testified that the issue of allocation of general defense costs would not be an issue of concern for a carrier in Royal's situation because Royal must assume that it will pay 100% of the claims costs that fall within the policy period. If Royal is able to share costs with another insurer, this would typically be advantageous to Royal. Although both of Royal's experts indicated that SDG should have disclosed the agreement of other insurers concerning allocation, they did not give an explanation of their conclusions that this omission was material.

Moreover, this court has previously held that the allocation of defense costs is a matter of contractual interpretation, and, therefore, SDG's failure to disclose its intent regarding the proper method of allocation of defense costs under the policy does not constitute a material omission. (See Order Denying Plaintiff's Motion For Summary Judgment on the Issue of Whether the Policy of Insurance is Void Ab Initio entered May 11, 2000). To the extent that allocation of general expenses is covered by the policy, SDG's intent amounts to nothing more than its own opinion or interpretation of a policy provision. To the extent that allocation of general expenses among policy years is not

addressed by the policy, any allocation would be the result of a later agreement among carriers or a later judicial determination. Obviously, neither of these eventualities would have occurred prior to the inception of the policy, and neither amounts to a fact that SDG was required to disclose during the policy negotiations.

■ Second, Royal argues that SDG misrepresented the amount of legal expenses incurred. In the September 28 letter portion of its submission, SDG stated that through August 1995 it had expended $5,000,000 in defense costs, averaging $275,000 per month, "although there has been a recent *spike* in defense costs due to Judge Bechtle's ambitious discovery schedule" (emphasis added). The September 28 letter also noted that SDG anticipated spending at least $600,000 per month on defense costs for the next few months. The narrative portion of the submission predicted that defense costs would "*skyrocket*" (emphasis added) for the next three or four months. The submission also included information that expenses of $3,598,735.55 had been spent and charged to the 1993–94 policy year and that $582,382.03 had been spent and charged to the 1994–95 policy year. All representations about expenses were accurate at the time they were made.

Royal's argument is not that SDG's representations were untrue when made, but that SDG should have furnished it information about legal expenses incurred prior to inception of the policy, but not billed to SDG until after the policy was issued. Royal presented evidence that from July 1995 to November 1995, Pepper Hamilton's billings for general defense costs alone averaged $700,000 per month. SDG's total litigation expenses actually exceeded $1,000,000 in August 1995 and approached $2,000,000 in October 1995. There is no evidence, however, that SDG had actual

knowledge of the legal expenses being incurred by its counsel during those months. Instead, SDG did not learn of the total litigation expenses until such expenses were invoiced and finally approved for payment.

SDG forthrightly and dramatically described its expectations with regard to an increase in defense costs over the months preceding and following issuance of the Royal policy. Use of words like "spike" and "skyrocket" was fully adequate to convey to Royal the fact that it could expect to have responsibility for extremely substantial litigation costs. SDG was not required to describe its expenses more precisely, particularly given the fact that it did not have more precise information at the time. Quite simply, SDG did not misrepresent its legal expenses to Royal.

■ Royal's third argument is that SDG misrepresented the number of claims and failed to disclose the existence of conspiracy claims against it. The narrative included with the submission notes efforts to encourage claimants to assert their claims in the MDL proceeding and expresses hope that SDG will have a "fairly good picture" of the federal claims by mid-September. In the September 28, 1995, letter included with its submission, SDG informed Royal that 760 claims had been filed. The letter stated that it was difficult to project the company's exposure and the number of future cases and tied the difficulty in making projections to the effect that future judicial rulings would have on the cases. The letter expresses hope that these rulings will reduce the number of claims and dispose of existing claims. The letter also includes the information that plaintiffs' attorneys have told SDG that they intend to assert a number of additional claims in the future.

Between October 17, 1995, the date the submission was sent to Royal, and the date of issuance of the policy, SDG received over 2,000 additional claims. SDG did not provide specific information to Royal about these claims prior to issuance of the policy, but did make Chamberlain generally aware of new claims in the November 21 conference call. Meanwhile, Dixon had made his November 1 request for a list of all claimants and dates of claims. The parties thus contemplated that Royal would have full, detailed information about the claims. In fact, Royal did receive such information, although, due to the extensions granted by Royal, it came after issuance of the policy, which was issued subject to receipt of the information.

If Royal had not requested the claims list, SDG might arguably have had an obligation to update the information in the September 28 letter prior to issuance of the policy. Under the circumstances of this case, however, an update including an approximate number of new claims—the only sort of update SDG could have provided prior to issuance of the policy— would have been pointless. Claims filed prior to the inception of the policy would not be included under the Royal claims-made policy. Any materiality of the updated claims information would be in its tendency to show an overall number of claims to which SDG was exposed at that point in time. Yet, Royal had much general, accurate information to assist in evaluating SDG's exposure and its risk. Royal's conduct when it received the list strongly indicates that it did not consider the precise number of claims to be a material factor that increased its risk. Although the policy was issued subject to receipt of the list and Royal could have avoided or terminated the policy upon receiving it, it did nothing. Royal's failure to act suggests that it was more concerned about an accurate list showing which claims were not covered by its policy than it was about an increase in risk due to new claims. Given the information Royal had,

SDG's failure to disclose the precise number of new claims prior to issuance of the policy was not a material omission.

Royal also claims that SDG failed to disclose the possibility of conspiracy claims against SDG in the bone screw litigation. The conspiracy claims were claims filed by plaintiffs who did not have an SDG product but complained that they were injured as a result of an industry conspiracy to promote the unapproved use of the bone screw in attachment. While the submission does not use the word conspiracy, SDG did clearly advise Royal that a basis for the claims was use of screws in violation of FDA approval restrictions. There is no evidence, however, that a failure to describe conspiracy claims with specificity was in any way material to the risk. Conspiracy claims were not a significant aspect of SDG's exposure at the time the Royal policy was issued. Royal's argument essentially asks the court to look at conspiracy claims filed during the policy period and infer that SDG knew these claims would be filed in the future at the time the policy was issued. The record does not permit such an inference.

Fourth, Royal contends that SDG misrepresented the meaning and effect of the designated product exclusion. No evidence supports this contention other that Dixon's testimony that he wanted to exclude all the bone screw litigation from coverage and thought that he was doing so by the designated product exclusion and Chamberlain's testimony that he communicated this same intent during the November 21 call. The testimony of Dixon and Chamberlain on this point is simply not credible.[15] The written communication between the parties, the careful negotiation of the language of the designated product exclusion, Royal's agreement to change "or" to "and," the plain language of the policy, and the inclusion of bone screw sales in the premium calculation all demonstrate that Royal knew that only off-label bone screw uses promoted by SDG were excluded, not the entire bone screw litigation. In fact, when Dixon used broad exclusion language in his November 1 fax, Forrester immediately corrected him about the intent of the exclusion. On November 15 Dixon responded, confirming Royal's intent not to exclude all bone screw claims. Dixon and Chamberlain were experienced, sophisticated underwriters, who knew exactly what Royal was agreeing to cover and exclude.

One aspect of Royal's argument about the designated product exclusion is an assertion that SDG failed to disclose its interpretation of the exclusion. This argument is incorrect as a factual matter— SDG did describe to Royal its interpretation of the exclusion and its reasons for needing the particular language it suggested. Moreover, as noted in the allocation discussion, SDG had no duty to disclose its position with respect to interpretation of policy provisions.

Fifth, Royal argues that SDG misrepresented the phrase "class action and related litigation" in its submission. Royal's reasoning on this point is murky, at best, but it apparently objects to the use of class action in a colloquial sense to describe the MDL litigation after Judge Bechtle denied class certification.[16] Although the federal class action is referred to as pending and a

---

15. Chamberlain used the term "historical bone screw litigation" in his testimony. Although the context in which the term was used clearly related to the designated product exclusion, the use of the word "historical" could be a reference to the claims-made nature of the policy, an easy way of avoiding the clear import of the line of questioning.

16. Royal was aware that at least one other request for class certification was pending in state court between the time the submission was sent and issuance of the policy.

problem for SDG in the submission, the submission clearly indicates that class certification had been denied. The submission also advised Royal that the effect of the denial was expected to diminish the number of claims overall, but that new individual claims were expected. There was no misrepresentation on this issue and certainly no material misrepresentation that in any way increased Royal's risk. As evidence of its confusion, Royal points to Dixon's use of the term "class action" in the November 1, 1995, fax in which Dixon stated that Royal did not intend to "cover any of the class action losses tied to the bone screw failure currently litigated as well as bone screws as described in the designated products exclusion." This comment's most logical meaning is that it is simply a reference to the claims-made nature of the policy; Royal does not intend to cover claims that have been made prior to the policy period. Thus, individual claims by putative class members asserted prior to the policy period, *i.e.,* claims "currently litigated" are excluded. This interpretation is reinforced by Dixon's November 15 fax in which he refers to an intent to exclude subsequent claims from "any current class actions known to our insured." In addition, Royal's total failure to make any inquiries about the use of the term "class action" strongly suggests that it was not confused.

■ Finally, Royal argues that SDG violated the application warranty included on the unsigned, undated Repath Associates form included in the submission. Under Royal's theory, the application warranty became binding on the date the policy was issued and imposed a duty on SDG to update all application materials. Royal claims that SDG failed to fulfill this duty based on the alleged misrepresentations and omissions discussed above.[17] Royal's argument fails because this unsigned, undated application warranty did not become binding on SDG or a part of the agreement between SDG and Royal.[18] While Royal was entitled to consider the factual information in the form as part of the submission, the form itself had no relation to this particular insurance policy. The form was simply a vehicle chosen by SDG to transmit a few pieces of information included in the voluminous submission. Such an unexecuted form cannot become a part of the agreement by virtue of its inclusion with the submission materials. The Tennessee statutory and case law referred to earlier governs the parties' obligations with respect to the issues in this aspect of the trial, not an unexecuted application warranty.

Having considered each of Royal's claims individually, an overall observation about the issues before the court is appropriate. SDG was seeking coverage for a very difficult risk. Royal was well aware of that, and Dixon, its experienced underwriter, originally determined that the risk was too great. The information submitted by SDG was detailed and conveyed quite adequately the risk that Royal ultimately

17. Some of Royal's trial proof related to claims of misrepresentation in the Repath form that contained the warranty. As noted previously, Royal makes no argument for voiding the policy based on these alleged misrepresentations. Royal has therefore abandoned any claim about misrepresentations in the Repath form itself.

18. At the summary judgment phase of the case, Royal asserted that the signature on Forrester's letter to Scott which accompanied the submission constituted execution of the warranty by Sedgwick, acting as SDG's agent. It has abandoned that argument since it now contends it did not receive the letter. Although Royal is far from clear in its assertions on this point, presumably it now contends that Scott's letter to Royal constitutes the required signature. This argument cannot assist Royal, however, because Tri–City is the agent of Royal, not SDG.

920

agreed to accept. While both Simmons and Macon gave helpful testimony relating to the issues, the court, after reviewing the record carefully, finds Macon's testimony most convincing, particularly his conclusion that SDG's submission exceeded industry standards. Royal itself made few inquiries, confirming that it had the information needed to properly evaluate the risk. This record does not permit a finding that the policy is void due to material misrepresentations or omissions by SDG that increased the risk of loss.

Royal has not carried its burden of establishing by a preponderance of the evidence that SDG made material misrepresentations or omissions that increased Royal's risk of loss. Therefore, Royal has failed to establish a basis for finding the policy void *ab initio,* and it is in full force and effect, binding the parties. The ISOP and NHIC policies are also in full force and effect.